Jose **VERA–VILLEGAS**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

**No. 01–70398.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 2003.

Filed June 4, 2003.

Carol L. Edward, Seattle, WA, for the petitioner.

Terri J. Scadron, Office of Immigration Litigation, Washington, DC, for the respondent.

Before REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

REINHARDT, Circuit Judge.

■ In this case, we decide that, while documentary evidence showing that an alien was residing in the United States during a particular period may be desirable in establishing the date of entry, the time element of an alien's residency, like all other elements in immigration hearings, may be shown by credible direct testimony or written declarations. We emphasize, as we have many times before, that witnesses' testimony and other evidence may not be rejected on credibility grounds without a specific finding accompanied by a clear and direct explanation of persuasive reasons for such rejection. Finally, because homelessness is an all too common state in our society, we reject any suggestion that it is not credible that an immigrant, like Jose Vera–Villegas ("Vera"), who came to the United States because he thought it to be a land of opportunity, would find himself homeless and jobless for a period of time after his initial unlawful entry, and that he would not possess

written records or documents that would tend to establish his date of entry. We also note that Vera's story is a remarkable one and that the witnesses who testified to the facts regarding his timely presence in the United States are an impressive lot; we hold that their sworn testimony may not be rejected for the insubstantial reasons advanced by the Immigration Judge.

**I**

Petitioner Jose Vera–Villegas asserts that he entered the United States in February 1989. In March 1996, he was served with an Order to Show Cause ("OSC"), which charged him with entering the United States without inspection on or around January 1989. Vera acknowledged service of the OSC, conceded his deportability, and applied for suspension of deportation.

■ To qualify for suspension of deportation under former § 244(a)(1) of the Immigration and Nationality Act, as amended by the Illegal Immigrant Reform and Immigrant Responsibility Act ("IIRIRA"), Vera had to establish: (1) that he "ha[d] been physically present in the United States for a continuous period of not less than seven years" as of the date he was served with the order to show cause; (2) that he was a person of good moral character; and (3) that his deportation would result in extreme hardship to himself or to an immediate family member who was a United States citizen or lawful permanent resident. *Kalaw v. INS*, 133 F.3d 1147, 1150–51 (9th Cir.1997). Because he was served with the OSC on March 8, 1996, in order to meet the physical presence requirement in this case, Vera had to prove that he entered the United States on or before March 9, 1989.[1] *Id.*

1. This case is governed by IIRIRA's transitional rules. *Kalaw v. INS*, 133 F.3d at 1150 (9th Cir.1997). Under the transitional rules, Vera remains eligible for suspension of deportation under pre-IIRIRA law; he need not

apply for cancellation of removal. *Ramirez–Alejandre v. Ashcroft*, 319 F.3d 365, 376–77 (9th Cir.2003) (en banc). However, because Vera's application was pending when IIRIRA became effective, the stop-time rule applies to

At the hearing before the Immigration Judge ("IJ"), the INS did not dispute Vera's seven years of continuous physical presence. Rather, the IJ *sua sponte* determined that he could not meet his burden because, although he claimed to have entered the United States in February 1989, the contemporaneous documentation of his presence—the rental agreements and tax returns that proved beyond any question that he lived here—dated back only to early 1991.[2] Vera explained that he could not provide contemporaneous documentation of his first two years in the United States because he was homeless and worked as a day laborer during that time. To make up for the lack of a paper record, Vera offered his own testimony, the corroborating testimony of three live witnesses, and affidavits from numerous acquaintances who attested to the number of years he had lived in the United States, his good moral character, and the hardships he would face if he were deported. The IJ rejected this testimony because he believed that it was "implausible," "inconsistent," and too "general" to overcome the lack of contemporaneous documentation. In doing so, he clearly erred.

The testimony of Vera and his witnesses was both plausible and as specific as one could expect from a witness required to recall events that occurred seven years earlier. At the hearing, Miguel Valencia, a longtime friend of Vera's, testified first. He stated that he entered the United States in February 1990 and met Vera soon afterwards. At that time, Valencia explained, he and Vera were both homeless. They became friends because they both slept under the viaduct at Jackson Street in Seattle; they also dined together at the missions, which served free meals to the homeless. Although Valencia did not know the date that Vera entered the country, he stated that when he met Vera, he thought that Vera had already been homeless in Seattle for about a year. After three to six months, the two separated for work-related reasons and did not see each other for some time. Upon questioning by the IJ, Valencia testified that he had obtained a counterfeit Washington identification card several months after his arrival, that he did not know if Vera had one, and that he had never advised Vera to obtain a similar card. Valencia concluded his testimony by explaining that he and Vera renewed their acquaintance several years after their separation when, by chance, they discovered that they lived in apartment buildings that were located within a few blocks of one another. Since then, they have renewed their friendship and see each other frequently.

Vera testified next. He began by describing his existence in Mexico before he left to seek a better life in the United States. In Mexico, Vera was very poor; he worked about three days a week in construction and carpentry, getting paid 20 to 25 pesos per day. He and his family often did not have food to eat, and they lacked running water in their home, a single seven by five meter room that housed four adults and three children. Vera explained that, although he had once owned this home, several years ago he had transferred the title to his oldest daughter, who still lives there with her sister, brother-in-law, and their two children. Also living in

---

him. *Ram v. INS,* 243 F.3d 510, 515 (9th Cir.2001).

**2.** At the hearing, the INS attorney stated that Vera's counsel did not need to elicit live witness testimony on continuous physical presence; he thought the affidavits were sufficient on that point. He stated: "I don't think the continuous physical presence is the—is a big issue in this case." The IJ responded: "Well, it is actually, I'm afraid." (The statements on this page of the transcript appear to be attributed to the wrong parties. The context, however, makes clear who the speakers are.)

the house is Vera's oldest son, Jose Juan, who was deported from the United States in 1996.

Vera recounted that he arrived in the United States by train around February 1989 and made his way up to Seattle. For several years he lived under a bridge and at several missions, including the Morrison Mission. During that time he worked as a day laborer, gardening, lifting boxes, and cleaning houses. To find work, he stood in line outside the Millionaire's Club, a popular day labor pickup spot. Later, in 1990, he also worked cutting grass for two brothers named Eric and Alberto Pacheco. During this time, Vera had no identification and was paid in cash. In response to questioning from the IJ, Vera explained that he could not obtain identification because his birth certificate was in Mexico, and he could not send for his birth certificate because he lacked money for postage and a fixed address at which he could receive it. Upon further questioning, Vera added that because he could not speak English at the time, he did not know that he could have had his mail sent to general delivery at the Post Office. In 1990, when Vera obtained steadier work with the Pacheco brothers, he started saving money to buy working papers and sent away for his birth certificate. Near the end of 1990, Vera finally received the certificate at an address his pastor permitted him to use for the receipt of mail; in early 1991, he obtained papers and steady work.

Vera also testified about his relationship with Pastor Armondo Hernandez, whom he knew because Hernandez regularly ministered to the homeless in Seattle. Although they met months earlier—shortly after Vera entered the United States—Vera began attending Hernandez's church at the end of 1989. Toward the end of 1989 or the beginning of 1990, Hernandez allowed Vera to use the church's address as his mailing address. In addition, sever-al times a month during 1989 and 1990, Hernandez invited Vera to sleep at his house or in the church's van. Today, Vera still attends twice-weekly services at Hernandez's church, where he is an usher. Many of his fellow church members wrote affidavits in support of his suspension application.

Vera testified that his oldest son, Jose Juan, was deported several years ago. Vera stated that Jose Juan was, and probably still is, addicted to inhalants; he sniffed glue, cement, and paint thinner. Jose Juan was extremely violent, and before he was deported he assaulted Vera on four occasions. Vera asserted that today his memory is impaired because Jose Juan once hit him over the head with a chair. Vera testified that he had successfully obtained a protective order against his son in the United States, but that he would be unable to obtain one if he were deported to Mexico. His son currently lives with his two daughters in their house in Mexico and has threatened to kill him if he returns there. Vera stated that he is afraid of his son.

Vera is currently under the care of a doctor, and he testified that he takes medication for depression, anxiety, to subdue the voices in his head, and to help him sleep. His medications—Zoloft, Risperidol, and some others—cost around $340 each month, of which he pays $48. He has to take his medication every day and has been hospitalized several times for mental illness and attempted suicide. It is unclear from the record how long Vera has suffered from mental illness. He stated that he was not treated for mental health problems in Mexico and that he first got sick in the United States because of the stress caused by his son's drug problem. However, he also reported that in 1985 he tried to commit suicide with rat poison. The record reflects other suicide attempts

as well. Vera testified that if he were deported to Mexico, he would not be able to afford his medication.

Finally, Vera testified about his present life. He stated that he works as a janitor for American Building Maintenance, earning a salary of $9.40 per hour plus health insurance. His mental health condition has stabilized with medication. He has no criminal record. He supports his wife and his youngest son, Wescenlao, a tenth grader whom he described at the hearing as a "good boy." He is an usher at his church, which he attends twice a week, and he has many friends among the congregation. Vera stated that if he were deported, his wife and son—who are also undocumented—would be forced to accompany him to Mexico. He has nowhere to live in Mexico because his son now lives in his former house in Mexico City, and there is not enough room for him and his family in his parents' house in Tabasco, which his parents now share with his ten siblings. He fears for his life should he be deported.

Deborah Lynn Smokey, a social worker and Vera's counselor at Consejo Counseling and Referral Service, testified with respect to Vera's mental illness. She stated that Vera began receiving treatment from Consejo in 1992; she herself began treating him on a weekly basis in 1996, when his case was transferred to her. She testified that Vera has an Axis I diagnosis of severe, recurring major depression with psychotic features and borderline personality disorder, and that he is chronically suicidal. At the time of the hearing, he was being prescribed Zoloft, Risperidol, Lithium, and Klonopin; with his medication, he had a Global Assessment of Functioning ("GAF") score of 40, which indicates impaired functioning. She testified that Vera's condition had improved significantly since he began psychiatric treatment and counseling, but that he was dependent on his medications; without them, he would not be able to maintain employment and would probably commit suicide.[3]

Samuel Martinez, the next to testify, stated that he provided social and employment services to Vera during the summer of 1989. At the time, Martinez was the Director of Program Operations for the Washington State Migrants Council, a statewide service agency for migrant workers. Prior to the summer of 1989, Martinez explained, the Migrants Council serviced only those workers who lived in the Yakima Valley. However, during the summer of 1989, the organization decided to extend its services to low-wage workers in the Seattle area. During that summer, as preparation for the expansion, Martinez performed needs assessments for about twenty low-wage workers in Seattle. Vera was one of those workers. Martinez specifically recalled meeting with Vera twice in 1989, and once during a follow-up visit in 1990.[4] He testified that he did not have his notes of his meetings with Vera and could not get them because he left the agency about four years ago. However, he stated that he specifically remembered Vera, as opposed to the many other people he served over the years, because the summer of 1989 was a very exciting time for

---

3. Vera submitted reports from several mental health experts who opined that Vera would be unable to obtain psychiatric counseling and medication in Mexico.

4. Martinez's recollection of Vera's employment situation was somewhat different than Vera's, in that he testified that he thought Vera had steady employment in 1989 and did not work as a day laborer or stand outside the Millionaire's Club. However, Martinez also stated that he never actually visited Vera at his job site. Rather, he remembered that he formed his opinion by asking Vera if he was fully employed, which he defined as working over 20 hours a week. Under this definition, Vera said that he was fully employed.

his organization and he had very few clients that summer.

In addition to live testimony from witnesses, Vera presented affidavits from numerous people who corroborated his physical presence in the United States in 1989 and 1990. For example, in addition to testifying at the hearing, Martinez wrote a letter on Vera's behalf. Written in February 1997, the letter stated that Martinez had known Vera for eight years. Martinez wrote that he first met Vera when Vera was looking for employment and Martinez "helped him obtain temporary employment with friends of mine doing yard work and other odds and ends." The letter explained that the two stayed in touch over the years because Martinez is the father-in-law of Armondo Hernandez, the pastor of Vera's church. In addition, Martinez's nephew, who lives with Martinez, is good friends with Vera's youngest son, Wenceslao. Maria Diaz, a forewoman, declared that she saw Vera in the United States in February 1989, that she had gone to church and school with him, then worked with him, and saw him at least as often as every other day.

Several individuals submitted affidavits corroborating both Vera's presence in the United States in 1989 and 1990 and the fact that he was homeless at that time. Hernandez, Vera's pastor, submitted an affidavit stating that Vera was in Seattle in 1989 and 1990, and that during that time Vera sometimes lived with him in his home. Juan Jose Bocanegra, an administrator at a social service agency located at 115 Prefontaine Place, declared that Vera "participated with a group of us in discussions [about] homelessness, came to our offices regularly from 89–90"; he stated that Vera had entered the United States

by March 1989. Finally, Tony Hewitt, House Manager of the Bread of Life Mission, submitted a letter stating that Vera had stayed at the Mission's homeless shelter during the month of May 1989.

Still others submitted affidavits corroborating the fact that Vera had done landscaping work before he began his steady employment in 1991. Alberto Gallego declared that he had "met [Vera] while working in landscaping in 1989 in downtown Seattle. He is a very good person." Gallego declared that Vera had entered the United States in February 1989. Antonio Diaz, an Educational Counselor, stated that he "had seen Mr. Vera coming into [his] office for educational career matters, [had] seen him at church, and also [at] social activities." Diaz also stated that he had seen Vera doing yard work, and that Vera entered the country in February 1989. Roman Rivera, a mechanic, declared that "[m]y wife and I know Jose worked in landscaping and also know him through the Church that we attend"; he also thought that Vera had arrived in February 1989. Finally, Vera submitted several other affidavits from other members of his community who stated that they saw him in this country in February 1989 and who attested to his good moral character and his helpfulness to others.

In short, Vera presented an unusually strong case for suspension of deportation. There was substantial evidence that he entered in 1989 and no contrary evidence that supported the 1991 date selected by the IJ. Despite the strength of Vera's evidence, however, the IJ denied relief on the ground that he had failed to establish seven years of continuous physical presence in the United States.[5] Citing "generally known job opportunities in the Seattle

---

5. The Immigration Judge made an alternate finding that Vera did not make a showing of extreme hardship. Because the BIA declined to rule on extreme hardship, we do not reach this issue but remand so that it may do so. INS v. Ventura, 537 U.S. 12, 123 S.Ct. 353,

154 L.Ed.2d 272 (2002). However, we note that Vera with his evidence presents the following case for extreme hardship: Vera came to this country seeking a better life, without money or resources, struggling with a serious

area," as well as the supposed "inconsistency" between Vera's goal of seeking a better life in the United States and his lifestyle as a homeless day laborer, the IJ found that Vera's story "would have been plausible for a period of a few months, but certainly not for two years." He rejected the evidence from Vera's friends and service providers on the grounds that their testimony lacked specificity and their memories were unreliable. The IJ then explained that he had "considered all evidence submitted by the respondent on this point, including affidavits and testimony of acquaintances," but that he was "inclined to give greater weight to documentary evidence which was created contemporaneously with the event recorded." Because there was no contemporaneous documentation of Vera's first two years in the United States, the IJ denied relief.

The BIA affirmed, stating that it "agreed with the Immigration Judge's analysis and conclusion" that Vera's testimony was "relatively general" and "not entirely plausible." The BIA further stated that it "concur[red] with the Immigration Judge" that the corroborating testimony was "general, noncontemporaneous, and, at times, inconsistent with the respondent's own testimony." The BIA offered no independent analysis, gave no examples of any alleged inconsistencies, and cited no case law in support of its decision. Vera petitioned for review.

## II

 We review for substantial evidence the BIA's decision that an applicant has failed to establish seven years of continuous physical presence in the United States. *Kalaw*, 133 F.3d at 1151. Under this standard, we must uphold the BIA's decision if it is supported by reasonable, substantial evidence in the record. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We may reverse the BIA's decision only if "the evidence presented compels a reasonable factfinder to reach a contrary result." *de Leon–Barrios v. INS*, 116 F.3d 391, 393 (9th Cir.1997)(internal quotation marks omitted).

 When the BIA adopts the reasoning of the Immigration Judge, as in this case, we review the decision of the IJ, applying the rules set forth above. *Zahedi v. INS*, 222 F.3d 1157, 1162 (9th Cir.2000). Here, although the IJ did not make an explicit negative credibility finding, he did reject as implausible much of the testimonial evidence that Vera submitted in support of his application. We do not accept blindly an IJ's conclusion that a witness or a document is not credible. *Id.; Aguilera–Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir.1990). Instead, we closely examine the record "to see whether substantial evidence supports that conclusion, and ... whether the reasoning employed by the IJ is fatally flawed." *Aguilera–Cota*, 914 F.2d at 1381. The IJ must have "a specific, cogent reason" for rejecting a witness's testimony, and that reason "must bear a legitimate nexus to that rejection." *Zahedi*, 222 F.3d at 1165.

mental illness. In the fourteen years since he entered the country, he has supported his wife and son, obtained treatment for his mental illness and gained better health. Aided by his medication, Vera is able to perform as a respected member of his community. If he were deported, however, he risks serious injury or even death, either at the hands of his son, who has threatened to kill him, or at his own hands, because, according to the evidence he introduced, in Mexico he will likely not have access to the psychiatric medications and counseling that kept him alive and that have allowed him to function effectively in the United States. The BIA's assessment of undue hardship on remand should take cognizance of these facts along with any other relevant evidence in the record.

■ The IJ's rejection of Vera's testimony as "implausible" was supported by speculation and conjecture, not substantial evidence. The IJ offered three reasons for disbelieving Vera's testimony. First, he stated that Vera's living and working circumstances when he first arrived in the United States as an undocumented alien—sleeping under a bridge and working as a day laborer—were "inconsistent" with his stated goal of moving to the United States to seek a better life. This reasoning is "fatally flawed." *Aguilera–Cota*, 914 F.2d at 1381. A goal of achieving a better life is not inconsistent with a two year period of homelessness, especially when the homeless person is poor, speaks no English, and has a serious, undiagnosed, and untreated mental illness. Many homeless persons have the goal of a better life. A number of others suffer from mental illnesses. Few homeless persons are both mentally sound and satisfied with their plight. Accordingly, this is not the kind of "specific, cogent reason" required by our case law as substantial evidence for rejecting a suspension applicant's testimony.

■ Second, the IJ claimed that Vera's testimony was "inconsistent with the generally known job opportunities in the Seattle area for aliens who are willing to use fraudulent Immigration documents to seek employment." We reject this argument as well. The IJ's conclusion must be supported by "reasonable, substantial evidence *in the record.*" *Shah v. Ins,* 220 F.3d 1062, 1067 (9th Cir.2000)(emphasis added). Here, there is no evidence in the record, substantial or otherwise, of "generally known job opportunities in the Seattle area." The IJ's view was based on mere speculation and conjecture, and because "conjecture is not a substitute for substantial evidence," this "reason" cannot serve as a basis for rejecting Vera's testimony. *Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir.1996).[6]

Finally, the IJ suggested that Vera's testimony was suspect because he "never registered with the Millionaire's Club, and he was not able to name any of the people he worked for during that time." This statement is flatly inconsistent with the evidence in the record. First, Vera never testified that he obtained employment through the Millionaire's Club; rather, he stated that he was hired from a day labor pick-up spot that was located outside the Millionaire's Club. Since Vera did not work for the Millionaire's Club, and it did not assist him in obtaining work, there was no reason for him to "register." Second, Vera did name people for whom he worked; he testified that in 1990 he cut grass for Eric and Alberto Concheco. This so-called "inconsistency" does not provide substantial evidence to reject Vera's sworn testimony.

■ The IJ's reasons for rejecting the testimony of Vera's witnesses were, if anything, even less persuasive than those he gave for rejecting Vera's testimony. The IJ never directly found that Vera's wit-

6. The IJ insinuated that Vera's credibility was impugned by his "willingness to use fraudulent Immigration documents to seek employment" and conversely challenged Vera's account because Vera did not obtain fraudulent documents soon enough. Neither of these points is compelling. First, the IJ's logic is inherently flawed, for it is self-contradicting to challenge both the fact that Vera used fraudulent documents and did not use those documents soon enough. Second, our immigration laws do not presume that undocumented workers who seek suspension deportation are not credible. That Vera may have fraudulent papers that allow him to work is not in our view a sufficient reason to disbelieve his story about when he came to the United States. This is especially so in view of the extensive and specific evidence on the timing of the entry that Vera offered through testimony and affidavits.

nesses were lying. Instead, he contended that their memories were inaccurate or their statements insufficiently complete or detailed. Yet there is no substantial evidence that supports his belief that the memories of Vera's witnesses were faulty, and we do not believe that it was reasonable to demand more specificity than was provided. The degree of specificity required depends on a number of factors, including the amount of time that has passed since the occurrence of the events being related. Indeed, given the passage of time in this case, the provision of too much detail might in itself have been cause for suspicion and a credibility challenge. The IJ also failed to give any weight to the sheer number of individuals who were willing to state under oath, in detail or not, that they had met this impoverished homeless person during the period in question, and that they remembered doing so. The IJ suggests no reason why so large a conspiracy to commit perjury, or to "misremember" the facts, would have occurred among participants ranging from a member of the clergy, to the director of operations for a statewide service agency, to an administrator at a local mission, to just plain, ordinary working class immigrants who had worked with Vera or otherwise made his acquaintance.

The IJ cited two reasons for concluding that Valencia must have been mistaken in his testimony that he had lived under the same bridge as Vera for a period of several months in 1990. First, the IJ stated that the "event ... occurred seven years ago and was of short duration." This is not in itself reason to believe that the testimony is erroneous. Moreover, this statement mischaracterizes the evidence. It is not as if Vera and Valencia passed in the night seven years ago and never saw each other again. Rather, for over three months they lived together under a bridge and took their meals together at the missions. Then, a few years later, they renewed their acquaintance and became friends who see each other regularly to this day. Because the IJ believed that Valencia was testifying truthfully that he had been homeless in 1990, the IJ had no reason to disregard Valencia's testimony that he knew Vera at that time.

Second, the IJ faulted Valencia for his inability to recall the names of Vera's wife and children. However, the two types of memories are unrelated. One could easily recall spending several months with someone during a memorable period of one's life and yet forget the name of that person's wife. Valencia's lack of memory is especially understandable here, because Vera was estranged from his wife and oldest son, so Valencia had no reason to know their names. (Valencia remembered accurately that Vera's youngest son was still in school and had an unusual name.). The IJ had no "specific, cogent reason" to impugn the quality of Valencia's memory, and the decision to reject that testimony was not supported by substantial evidence.

Similarly, the IJ had no specific, cogent reason to reject the testimony of Martinez, who testified that he interviewed Vera and provided employment services to him during the summer of 1989. The IJ disregarded Martinez's testimony because of an alleged "inconsistency": Martinez testified that Vera had had a steady, fulltime job in 1990, whereas the IJ stated that Vera testified that "in 1990 he was still working for the Millionaire's Club."[7] According to the IJ, this "inconsistency" demonstrated that Martinez's memory was flawed.

---

7. Once again, the IJ mischaracterized the evidence. As discussed above, Vera testified that he stood outside the Millionaire's Club, not that he worked for the Millionaire's Club. In addition, he testified that in 1990 he worked cutting grass for Eric and Alberto Pacheco.

■ We find no inconsistency in the testimony. Upon further questioning, Martinez stated that he had never visited Vera at his job site and did not know what kind of work Vera performed; Martinez only knew that Vera had told him that he worked more than twenty hours per week. Vera could have worked as a day laborer for more than twenty hours per week, in which case Martinez would have classified him as having steady work. The differing testimony of Martinez and Vera merely reflects that they were asked different questions that required different levels of detail in response. Different levels of detail in testimony, however, are not a ground for a negative credibility finding. *Zahedi*, 222 F.3d at 1167–68. Furthermore, the fact that Martinez thought that Vera had steady work in 1990 does not suggest that Martinez did not interview Vera in 1989. The IJ's refusal to accept Martinez's testimony was not supported by substantial evidence.

■ The IJ's reasons for rejecting the affidavits in support of Vera were just as insubstantial as his reasons for rejecting the testimonial evidence. In this circuit, documentary evidence is judged by the same credibility standards that apply to testimonial evidence. *Id.* at 1164–65. Accordingly, "when rejecting the validity of a document admitted into evidence, an IJ must provide a specific, cogent reason for rejecting it, and this reason must bear a legitimate nexus to that rejection." *Id.* at 1165.

The IJ rejected the affidavit of Hernandez, Vera's pastor, on the ground that Hernandez did not provide "the dates that the respondent purportedly lived with him." According to the IJ, this failure to provide dates did not suggest that Hernandez was lying, but that his memory was unclear. This assertion is untenable. A person who invites a homeless person whom he knows to spend some nights in his home from time to time would not ordinarily mark down the specific dates on which the offer was accepted and would be unlikely to have retained any such notes for a seven year period. In addition, the IJ's observation that Hernandez had "undoubtedly" met "hundreds of people like the respondent" cannot support the rejection of Hernandez's affidavit. There is no evidence in the record that Hernandez knew "hundreds of people like the respondent." In fact, it is unlikely that Hernandez knew anyone like Vera, who by all accounts is a unique and memorable individual. Although Hernandez "undoubtedly" ministered to many homeless and undocumented immigrants over the years, it was unlikely that he invited most of them to stay in his home, that the ones he did attended his church twice weekly for eight years, or that they had sons who became close friends with a member of Hernandez's immediate family. The IJ's decision to reject Hernandez's affidavit was based on whim and personal conjecture, not substantial evidence.

The IJ rejected the letter from Tony Hewitt of the Bread of Life Mission on the ground that it did not "provide sufficient detailed information to give [it] enough reliability to overcome the adverse elements previously discussed." This statement was inaccurate because the IJ had not previously discussed "adverse elements" with respect to this particular piece of evidence. The letter stated that Vera lived at the Mission from the beginning to the end of May 1989. It is very specific as to dates, and there was no reason to reject it. Similarly, the IJ provided no individualized reason for rejecting the affidavit of Antonio Diaz, who declared that he worked in landscaping with Vera in 1989. Since no "specific, cogent reasons" support the exclusion of this evidence, it must be considered as support for Vera's claim.

Finally, the IJ rejected the many affidavits presented by members of Vera's community, all of whom attested that Vera had entered the country in February or March 1989. While some of these affidavits were short on explanatory detail, and might deserve minimal evidentiary weight if they stood alone, they were important and meaningful in the circumstances of this case. When a substantial number of individuals are willing to step forward and swear under oath that an undocumented immigrant has lived in their community for a particular period of time, the collective weight of their declarations cannot be dismissed without a reasoned and persuasive explanation.

### III

 Ultimately, when all the conclusory phrases and unsupported speculation are stripped away, the IJ had but one reason for concluding that Vera could not establish seven years of continuous physical presence in the United States: Vera lacked documentary evidence, such as a lease, insurance bill, or tax return, to prove his physical presence in the United States in 1989 and 1990. We hold that this is not an adequate basis for rejecting a petitioner's application for suspension of deportation if the oral and written testimony offered is otherwise sufficient. The regulations do not impose any specific evidentiary requirements on applicants for suspension of deportation. *See* 8 C.F.R. § 240.65. The instructions that accompany the suspension application state that only two documents are "required," and Vera submitted them. *See* Instructions, Application for Suspension of Deportation, *available at* http://www.visapro.com/US-Immigration-Forms/Suspension–of–Deportation–Form.asp (requiring a Biographic Information Form G–325A and a Fingerprint Card, FD–258). The instructions suggest that an applicant "should" submit documentary evidence to show that he has

been present for the required statutory period, but they do not state that he "must" do so. *Id.* Although the general regulation creates a presumption of ineligibility for failure to file *required* documents, there is no such presumption for the failure to file *suggested* documents that are not actually required. *See* 8 C.F.R. § 103.2(b)(2).

 The decision of the IJ to reject Vera's testimonial evidence because it lacked supporting contemporaneous documentation is unreasonable and contrary to the established method by which we litigate matters in our justice system, including in administrative hearings. Courts and litigants have long relied on testimony alone, whether in the form of affidavits, declarations, depositions, or live witnesses, to prove antecedent facts. *See, e.g., Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 155, 2 L.Ed. 60 (1803) (relying on affidavits for factual support). While contemporaneous documentary evidence may add to the credibility of a witness, it is by no means indispensible. It is unreasonable to discredit the sworn testimony of a witness for the sole reason that there is no contemporaneous documentary evidence to support it, especially when there may be valid reasons why no such evidence exists. It is especially unreasonable to impose a contemporaneous documentation requirement on homeless people, who will likely never have documentation that they lived in a particular locale; on undocumented immigrants, who often work for low wages paid in cash and who seek to avoid creating official records of their presence; and on the mentally ill, whose disabilities often compromise their ability to comply strictly with evidentiary rules. *Cf. Ladha v. INS,* 215 F.3d 889, 900–01 (9th Cir.2000) (holding that when an asylum seeker offers credible testimony, she need not support her claim with *any* corroborating evidence

because "[a]uthentic refugees rarely are able to offer direct corroboration of specific threats"). Finally, it is unacceptable to require aliens (or others) to present evidence that they cannot readily obtain or to penalize them for failing to provide documentation that does not exist. There is no reason that Vera, a formerly homeless person and an immigrant who suffers from mental illness, should be held to so unreasonable a standard.

## IV

We hold that Vera met his burden of proving seven years of continuous physical presence in the United States, and that there is no substantial evidence to the contrary in the record. Vera testified credibly that he entered the country in February 1989 but lacks contemporaneous documentation of his presence because he was homeless and was working as a day laborer. He testified that he lived under a bridge, at the missions, and sometimes at the home of Armondo Hernandez, the pastor at his church. His testimony was corroborated by Miguel Valencia, who testified that he knew Vera in 1990 when both men were homeless and slept under the Jackson Street viaduct; by Samuel Martinez, who testified that he met Vera in the summer of 1989 when the Migrants Council expanded its services to Seattle, and who wrote in 1997 that he had known Vera for eight years; by Hernandez, who affirmed that he had allowed Vera, who was then homeless, to stay with him at his home during 1989 and 1990; by Tony Hewitt, who submitted an affidavit that Vera lived at the Bread of Life Mission during the month of May 1989; by Antonio Diaz, who declared that he worked with Vera in landscaping in 1989; by Juan Jose Bocanegra, who affirmed that Vera came to his agency's office regularly from 1989 to 1990; by Maria Diaz, who testified that she saw Vera in the United States in February 1989, that over the years she had

attended church, school, and work with him, and that as a result she saw him at least every other day; and by numerous other individuals and social service providers who submitted affidavits stating that they encountered Vera in the United States in February or March 1989. The fact that Vera was homeless and had difficulty finding a job is further corroborated by the fact that he has serious mental health problems that were undiagnosed and untreated at that time. There is no evidence in the record that even remotely suggests that Vera was anywhere other than in the United States during 1989 and 1990. In sum, substantial evidence does not support the IJ's determination that Vera failed to prove seven years of continuous physical presence. To the contrary, "the evidence presented compels a reasonable factfinder to reach a contrary result." *Lopez–Reyes,* 79 F.3d at 911. Accordingly, we grant the petition for review and remand to the BIA for further proceedings consistent with this opinion.

PETITION GRANTED and REMANDED for further proceedings.