**Mahamoud Dowlad SHIRE, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 03–70044.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 2004.

Filed Nov. 18, 2004.

---

11. *Indep. Fed. of Flight Attendants v. Zipes,* 491 U.S. 754, 761, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989).

Bernadette W. Connolly, San Jose, CA, for the petitioner.

Anh–Thu P. Mai, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

Before: T.G. NELSON, TASHIMA, and FISHER, Circuit Judges.

TASHIMA, Circuit Judge.

Mahamoud Dowlad Shire, a native and citizen of Somalia, petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the decision of the Immigration Judge ("IJ"). The IJ denied Shire's application for asylum, withholding of removal, and for relief under the United Nations Convention Against Torture ("CAT") based on an adverse credibility finding. The IJ thus ordered Shire deported. The BIA affirmed. We grant the petition.

## BACKGROUND

### I. Factual Background

Shire was born in the city of Merka in Somalia in 1973. He is a member of the Tunni clan, a "small minority clan" that is "despise[d] by majority clans." His father was a fisherman and his mother a housewife. They had six children—five sons and one daughter.

While Shire was growing up, Somalia was ruled by Mohamed Siad Barre, a member of the Darod clan. In December 1990, fighting broke out between members of the United Somali Congress ("USC"), who were from the Hawiye clan, and Siad Barre's government. In February 1991, the USC captured Shire's city of Merka and began murdering members of minority clans such as Shire's.

On February 6, 1991, all the members of Shire's family were home when armed members of the USC entered the home. The intruders wore t-shirts with the letters "USC" written on them and chanted slogans in favor of the Hawiye clan and against the Darod clan. They then threatened to kill "you stinking people who were working with the Darods" and take their property. Shire testified that his family had not been politically involved, but that the USC merely wanted to take revenge against them as members of the Tunni clan because some Tunnis had worked for the former government.

Shire's parents pleaded to be left alone because they were poor people who had never collaborated with the former government. The USC members then began to beat them with their rifle butts. When Shire attempted to intervene, he was beaten also. The intruders then took Shire's fifteen-year-old sister and began to rape her. Shire's seventeen-year-old brother attempted to help her, but the USC mem-

bers shot him in the back and killed him. The leader of the intruders then grabbed Shire's arm, said they would teach him a lesson, and cut off Shire's right thumb.[1] Shire passed out after his thumb was cut off.

When Shire awoke, he was in a boat with his family, fleeing to Mombasa, Kenya. He then learned that the USC members had killed his sister after gang raping her. Shire was in pain and had a fever, having received no medical treatment for his thumb and for the beating he suffered. Conditions aboard the boat were poor; some children died of hunger and disease and were thrown overboard.

Shire received medical treatment at a hospital in Mombasa, where he stayed for about two weeks. In March 1991, he joined his family at a refugee camp in Kenya called Showground, the site of former fairgrounds. He and his family stayed at the camp until May 1991, when they were relocated to the Utanga refugee camp. Kenyan authorities closed the Utanga camp in April 1995, at which point Shire and his family moved to the Ifo refugee camp. Shire married his wife, Amina Ahmed Mahamed, in the Ifo camp in June 1998.

Shire testified that, while his family was in the Utanga refugee camp, his father filled out a United Nations ("UN") form in order to get a food ration card for the family. The purpose of the UN forms seemed to be limited to determining food rations, not to apply for some type of refugee status. Because the conditions in the camp were so poor and were worsening, Shire left the camp in May 1999 and went to Nairobi. From there, he contacted his cousin, who lived in the United Arab Emirates. This cousin sent Shire $4500.

---

1. Shire showed his right thumb to the IJ at the hearing, and the IJ stated that the thumb looked as if it had been cut off below the first joint.

Shire used $4000 of this money to hire a smuggler, named Lul Diriye, to bring him to the United States. Diriye gave Shire a Kenyan passport and instructed Shire that he was to pretend he was her husband. Diriye told Shire that the name on the passport was Mohamud Hussein Hassan, although Shire testified that he did not read the name and was unsure whether that was correct. Diriye further instructed Shire to stick to the story that she gave him, which was that he was 30 years old and a mechanic, she was 28 years old, and they were both born in Nairobi, Kenya.

On May 24, 1999, Shire and Diriye flew on a British Airways flight from Jomo Kenyatta Airport in Nairobi, Kenya, to London, England. Before they departed Kenya, an immigration official checked their passports and asked for their occupations, speaking in Swahili. Diriye, who spoke Swahili, interpreted for Shire, who spoke Somali. After stopping in London, they flew to New York City, arriving on May 25, 1999.

Shire testified that, when they arrived in New York City, immigration officials asked questions similar to those they had been asked in Kenya. They were asked whether they had money, what address they would be staying at, how long they would stay, why they were coming, and what their occupations were. When they first deplaned, they "entered through a tunnel and after some time [they] came to the area where the Immigration officers were." He testified that he spoke with one officer, a man, wearing a white shirt with a green badge on the shoulders and black pants. The officer asked questions in English, Shire spoke in Somali, and Diriye interpreted. Shire did not understand what the officer asked Diriye because they were speaking in English. The

officer examined Shire's passport and visa and, after questioning Shire, stamped the passport. They then left and went to retrieve their luggage. Shire then testified as follows, in response to cross-examination by counsel for the Immigration and Naturalization Service ("INS"):[2]

Q. What did you do then.

A. We walked a little farther and approached the area where we were supposed to pick the luggage from.

Q. And what happened?

A. We took the luggage.

Q. And what happened then?

A. We went outside.

Q. So you didn't have to see any more Government officials at the airport?

A. There were other Government officials there, but no one else spoke with us.

Q. And what luggage did you have?

A. I had a small bag, but she had a case, a brief case.

Q. And you took that and left the airport?

A. Yes.

Q. And nobody searched your luggage?

A. The luggage were searched.

Q. Well, I'm confused. You said you took the luggage and then you went out of the airport, but it was searched before you left the airport?

A. Yes, I forgot that they—that the bags were searched.

Q. Well, who searched the bags?

A. A uniformed man told us to open the bags.

Q. What was the uniform?

A. They were like the first one. They had white shirts and black pants, and

**2.** The INS has been abolished and its functions transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2142 (2002), 6 U.S.C. §§ 101–557. We will refer to the government agency as the INS.

they had a tie. They asked us to open the bags and we opened the bags.

Q. And where did they ask you to open the bags?

A. They asked us when we were taking the baggage from the baggage claim area.

Q. But earlier you said you never talked to any other Government officials.

A. I think I told you that I forgot about that. I'm a human being. I made a mistake.

Q. And so what happened after you opened the bags?

A. They searched the bags and we wrote out some of the (indiscernible) and they told us to close our bags.

Q. And then what happened?

A. We closed our bags and we left.

Certified Administrative Record 227–28.

Shire and Diriye then took a taxi to the bus station, where Diriye bought Shire a ticket to San Diego. Shire had been told that there were many Somalis in San Diego and that it would be easy for him to apply for asylum there. Diriye took the passport and the British Airways ticket Shire had used.

Under cross-examination, Shire testified that it took three days to travel to San Diego from New York. The bus stopped at several different places, to allow passengers to eat, and to allow some passengers to disembark and new passengers to board, but Shire could not remember the number of times the bus stopped. Shire no longer had the ticket from the bus trip because he had thrown it away and never tried to get a copy of the ticket from the bus company.

After Shire testified, the INS called John McCarthy, an immigration inspector for the INS, to testify. McCarthy had worked at an airport in San Diego, which "handles two to four, two to five flights a day," but never in New York. McCarthy testified that when passengers arrive at an international airport, a primary inspector initially speaks to the passengers, examines their documents, and either "will admit them if everything appears to be in order," or refer them to a secondary inspection. He also stated that, if one passenger "attempts to participate in the inspection of another individual it arouses the inspector's level of suspicion," and those two generally would be referred to a second inspection.[3]

McCarthy also testified about the Nonimmigrant Information System ("NIIS"), a "service-wide database that's used to track the arrivals and departures of all nonimmigrants entering the U.S. and leaving the U.S." The INS then showed McCarthy Exhibit 14, which was a document prepared by McCarthy stating that he had performed a search of the NIIS regarding the admission of an individual named "Mahamoud Dowlad Shire" into the United States through New York in May 1999 and that the "queries were negative, indicating no such admission was made." The INS also submitted into evidence a memo by McCarthy stating that he had performed NIIS queries regarding the admission of "Hassan Mahamoud (Mohamud) Hussein and Mahamoud Dowlad Shire."

McCarthy testified that the NIIS is compiled from INS Form I–94, which every passenger on an incoming flight is required to fill out. The I–94 is given to the immigration inspector, who examines the form to ensure it is completed correctly. The forms are forwarded to a service center in Nebraska, where the data are entered into the INS database.

---

3. McCarthy did not, however, specifically relate his comment about the participation of a second passenger to the context of translating from a language which the inspector did not understand and in which the INS had no local capability to interpret.

## II. Procedural Background

Shire filed an asylum application on June 18, 1999, less than one month after his arrival in the United States. The INS denied the application and served Shire with a Notice to Appear on August 10, 1999. Following several hearings, the IJ denied all relief.

In his decision, the IJ stated that the initial question was whether Shire had demonstrated by clear and convincing evidence that he had applied for asylum within one year of arriving in the United States, as required by 8 U.S.C. § 1158(a)(2)(B). The IJ concluded that Shire had failed to carry his burden, based on an adverse credibility finding. The adverse credibility finding was based solely on Shire's testimony of his arrival in New York and his journey to San Diego. The IJ found Shire not credible, citing numerous details of Shire's testimony that he found suspect. The IJ also relied on Shire's failure to provide corroborating evidence, such as verification of his bus trip to San Diego and of his presence in the refugee camps.

The IJ thus concluded that Shire had failed to present a credible claim to support his asylum application, commenting, however, that, if Shire were credible, he "would see no problem about granting his application in the exercise of discretion." The IJ therefore denied Shire's application for asylum, withholding of deportation, and relief under the CAT, and ordered Shire deported to Somalia. The BIA affirmed, expressly adopting the IJ's credibility findings. Shire filed a timely petition for review.

## JURISDICTION

█ We agree with the INS that we lack jurisdiction to review the BIA's denial of Shire's application for asylum because the BIA's decision was based on Shire's alleged failure to file his asylum application within the one-year deadline set forth in 8 U.S.C. § 1158(a)(2)(B).[4] *See* 8 U.S.C. § 1158(a)(3) (stating that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)"); *see also Hakeem v. INS,* 273 F.3d 812, 815 (9th Cir.2001) (reasoning that "we need only determine whether the IJ acted under section 1158(a)(2)," and therefore holding that we lacked jurisdiction to review the determination that the petitioner failed to file his asylum application within one year of his arrival in the United States).

█ Nonetheless, we do have jurisdiction under 8 U.S.C. § 1252 to review Shire's withholding and CAT claims because the one-year deadline applies only to the asylum application. *See Hakeem,* 273 F.3d at 816 (reviewing the IJ's denial of withholding of removal on the merits, citing our jurisdiction to review a final order denying withholding under 8 U.S.C. § 1252(a), after concluding that we lacked jurisdiction to review asylum claim).

## STANDARD OF REVIEW

█ "When the BIA deems a person to be not credible, it must ... provide specific reasons for its disbelief. Where, as here, the BIA adopts the IJ's credibility determination, we look through the BIA's decision to examine the IJ's reasons for deeming the person not credible." *Bandari v. INS,* 227 F.3d 1160, 1165 (9th

4. Section 1158(a)(2)(B) provides that "paragraph (1)[which allows an alien to apply for asylum] shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States."

Cir.2000) (citation omitted). The IJ's adverse credibility determination is reviewed for substantial evidence. *Singh v. Ashcroft*, 362 F.3d 1164, 1168 (9th Cir.2004). The IJ's decision may be reversed only if the evidence presented was so compelling that no reasonable factfinder could find that the petitioner was not credible. *Id.* Although this standard is deferential, the adverse credibility finding must be supported by specific, cogent reasons, and cannot be based on speculation and conjecture. *Ge v. Ashcroft*, 367 F.3d 1121, 1124 (9th Cir.2004); *Kebede v. Ashcroft*, 366 F.3d 808, 810–11 (9th Cir.2004).

## DISCUSSION

■ An alien may not be removed to a country if his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."[5] 8 U.S.C. § 1231(b)(3)(A). "An alien may establish the requisite threat through testimony alone." *Molina–Estrada v. INS*, 293 F.3d 1089, 1094 (9th Cir.2002) (citing 8 C.F.R. § 208.16(b)). "If the applicant is determined to have suffered past persecution in the proposed country of removal on account of" a statutorily protected ground, a rebuttable presumption arises "that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 208.16(b)(1)(i); *see also Baballah v. Ashcroft*, 367 F.3d 1067, 1079 (9th Cir.2004) (stating that, because the petitioner had established that he suffered past persecution, "a presumption arises that he is entitled to withholding of removal"). Persecu-

tion has been defined as " 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.' " *Baballah*, 367 F.3d at 1074 (quoting *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir.1996) (en banc)).

■ There can be no doubt that, if his testimony were to be believed, Shire has established past persecution. The IJ, in fact, stated as much when remarking that, if he had found Shire credible, "I would see no problem about granting his application in the exercise of discretion." Because he found Shire's testimony regarding his entry into the United States not credible, however, the IJ denied Shire's application.

The IJ's conclusion that Shire failed to comply with the one-year deadline found in § 1158(a)(2)(B) was based solely on his finding that Shire's testimony regarding his journey from Africa to the United States was not credible. The IJ's reasons for finding Shire not credible, however, are based on "impermissible speculation and conjecture," *Ge*, 367 F.3d at 1124, as well as on "minor memory lapses and inconsistencies on issues at the periphery of [Shire's] asylum claim," *Kebede*, 366 F.3d at 811. The IJ's adverse credibility determination accordingly is not supported by substantial evidence.

The IJ cited, first, his skepticism that Shire "was able to travel from Kenya to the United States using a passport that did not belong to him, containing data he was not sure of, and also a picture that 'looked like me.' " The IJ reasoned that "security procedures at modern-day airports simply

---

5. The standard for withholding of removal is more stringent than that for establishing asylum. *Salazar–Paucar v. INS*, 281 F.3d 1069, 1074 (9th Cir.2002), *amended*, 290 F.3d 964 (9th Cir.2002). "However, while the granting of asylum is discretionary, the Attorney General must withhold deportation 'if the evidence demonstrates a clear probability that the applicant would be persecuted were he to be deported to his home country....' " *Id.* (quoting *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir.1999)).

could not allow the respondent to enter the United States the way he claims," citing McCarthy's testimony. The IJ also reasoned that Shire's testimony that Diriye acted as an interpreter during his immigration inspection conflicted with McCarthy's testimony regarding standard INS procedure, as dictated by the immigration inspector's manual.

The IJ's skepticism is based solely on speculation and conjecture. The IJ gives no reason for his belief that an alien could not enter the United States using false documents, and there is no evidence in the record to support this belief. The IJ's speculation about Shire's ability to enter with a false passport is reminiscent of the basis for the IJ's adverse credibility determination in *Vera–Villegas v. INS*, 330 F.3d 1222 (9th Cir.2003). In *Vera–Villegas*, the IJ claimed that the petitioner's testimony of his difficulties finding work "was inconsistent with the generally known job opportunities in the Seattle area for aliens who are willing to use fraudulent Immigration documents to seek employment." *Id.* at 1231(internal quotation marks omitted). We rejected the IJ's view as unsupported by " 'reasonable, substantial evidence *in the record*' " and "based on mere speculation and conjecture," and therefore found that this was not a sufficient basis for rejecting the petitioner's testimony. *Id.* (quoting *Shah v. INS*, 220 F.3d 1062, 1067 (9th Cir.2000)). Similar to *Vera–Villegas*, there is no evidence in the record that indicates that it would be difficult for an alien to enter the United States using a false passport. "[T]his 'reason' cannot serve as a basis for rejecting [Shire's] testimony." *Id.*

Furthermore, although McCarthy testified about the procedures immigration inspectors were supposed to follow, his experience was based on his work at the airport in San Diego, which, by his estimate, "handles two to four, two to five flights a day," relying on only ten to twelve immigration officers and one supervisor. The airport in New York, by contrast, received "[p]ossibly" "twenty times" as many international flights per day and employed, perhaps, "a couple hundred" inspectors and a "few dozen" supervisors. To expect immigration inspectors to follow procedures in the manual scrupulously is speculative, at best, as is the expectation that an incoming alien will receive an immigration inspection in New York as rigorous as that which he might receive in San Diego. " '[S]peculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence.' " *Ge,* 367 F.3d at 1124(quoting *Shah,* 220 F.3d at 1071) (alteration in original). There is no evidence to support this basis for the adverse credibility finding.

 Another basis the IJ cited for the adverse credibility determination was Shire's testimony that, after the immigration inspection, he and Diriye "picked up their bags and left the airport, no one else speaking to them." The IJ stated that "[w]hen confronted about the possibility of Customs inspection, [Shire] backtracked, and contradicted himself, stating that yes, he and his companion had their bags searched by Customs officers." It is difficult to comprehend why the IJ would characterize Shire as "backtrack[ing]" and "contradict[ing] himself." It is apparent from the transcript that Shire merely found the search of their bags uneventful and that he forgot to mention this aspect of their clearance of customs. " '[M]inor discrepancies ... [that] cannot be viewed

as attempts by the applicant to enhance h[is] claims of persecution have no bearing on credibility.'" *Kebede* 366 F.3d at 811 (quoting *Damaize–Job v. INS*, 787 F.2d 1332, 1337 (9th Cir.1986)) (first two alterations in original). This clearly was an example of a minor discrepancy, not an attempt by Shire to enhance his claim. It cannot serve as a basis for an adverse credibility determination.

Furthermore, these minor details of Shire's experience going through the immigration inspection do not address the heart of the matter, which is the date on which he entered the United States. The only evidence in the record regarding the date indicates that he entered the United States in May 1999. That evidence consists of: his testimony; his asylum application; and an affidavit by Ahmed Osman Hersi, a friend of Shire's from Somalia who met Shire in the Ifo refugee camp, which states that the last time he saw Shire prior to seeing him in the United States was in the refugee camp in January 1998, and that Shire told him he entered the United States in May 1999.

Another basis for the IJ's adverse credibility finding was his skepticism that Shire could remember the details of the persecution he suffered in Somalia "as a 16–year-old boy" and yet could not remember the details of his bus trip from New York to San Diego, such as "the places he went through or visited." The IJ found it "highly improbable that a person coming to the United States, even with limited or no ability in English, would have no idea as to the cities that the person traveled through in coming across the continent." To the contrary, it seems highly probable that a person who had just arrived in the United States from Somalia and spoke no English would not recognize any of the cities through which he would travel on a bus trip across the country. Indeed, it seems highly likely that most Americans would not remember the names of many of the cities.[6] It is difficult to understand why the IJ would expect a non-English speaker, the son of a fisherman from Somalia, to even recognize, let alone remember, the cities he traveled through on a bus from New York to San Diego. Furthermore, it is not at all surprising that Shire should remember many details of the traumatic day when he was beaten and had his thumb brutally chopped off, his parents were beaten, his sister was gang raped and murdered, and his brother was murdered.

The IJ also questioned Shire as to how he could recall the exact words the members of the USC used when they entered his home, stating that there was a discrepancy between Shire's testimony in the first hearing and the second hearing. The only discrepancy, however, was in the precise words used by the USC members as they entered Shire's home.[7]

It is unclear why the exact words spoken by the USC are relevant to Shire's

---

**6.** A survey conducted in 2002 by the National Geographic Society found that one in ten Americans between 18 and 24 years of age could not even locate the United States on a world map. *See generally* http://www.nationalgeographic.com/geosurvey/download/RoperSurvey.pdf.

**7.** The IJ questioned Shire's credibility, stating that, "there is a discrepancy because at the first hearing you did say that these men entered and said 'Darods fall down, Hawiye come back' and then they also said 'this is the time you stinky people working with the Darods we will take all of your property for ourselves.' So the question is, sir, why did you tell us about this stinky people remark in the first hearing, but you did not remember it in this hearing if you have such a clear memory of what they said."

claim. These alleged inconsistencies "are not 'significant and relevant' and do not support an adverse credibility determination." *Kebede,* 366 F.3d at 811 (quoting *Lata v. INS,* 204 F.3d 1241, 1245 (9th Cir.2000)); *see also Wang v. INS,* 352 F.3d 1250, 1253 (9th Cir.2003) (" 'Generally, minor inconsistencies and minor omissions relating to unimportant facts will not support an adverse credibility finding.' ") (quoting *De Leon–Barrios v. INS,* 116 F.3d 391, 393 (9th Cir.1997)). Rather, in making the adverse credibility finding, "the IJ picked at minor memory lapses and inconsistencies on issues at the periphery of [Shire's] asylum claim." *Kebede,* 366 F.3d at 811. Because an IJ's adverse credibility determination "may not rest on incidental misstatements that do not go to the 'heart' " of the petitioner's claim, the IJ's reliance on the slight discrepancy in Shire's testimony about the words spoken by the USC is not a valid basis for an adverse credibility finding. *Wang,* 352 F.3d at 1253(quoting *Ceballos–Castillo v. INS,* 904 F.2d 519, 520 (9th Cir.1990)).

■■■ The IJ also relied for his adverse credibility determination on Shire's failure to provide corroborating evidence. Where, however, "the [IJ] offers no legitimate reason to question the applicant's credibility, we must reverse a finding that the applicant failed to meet his burden of proof because he did not provide corroborating evidence." *Salaam v. INS,* 229 F.3d 1234, 1239 (9th Cir.2000). Because the IJ offered no legitimate reason to question Shire's credibility, we deem his testimony credible. *Id.; see also Akinmade v. INS,* 196 F.3d 951, 957–58 (9th Cir.1999) ("We conclude that the BIA's credibility determination rested on insufficient and impermissible grounds. As in other similar cases, under these circum-

stances, we deem the petitioner's testimony credible."). Shire therefore was not required to provide corroborating evidence. *Salaam,* 229 F.3d at 1239.

Furthermore, unlike cases in which we have found that the corroborating evidence was easily available to the petitioner, the corroborating evidence the IJ faulted Shire for failing to obtain was very difficult to obtain. *Compare Chebchoub v. INS,* 257 F.3d 1038, 1044–45 (9th Cir.2001) (finding that "securing an affidavit from a close relative living in Western Europe" and from individuals living in the United States was material evidence easily available to the petitioner that he should have produced), *and Sidhu v. INS,* 220 F.3d 1085, 1089–92 (9th Cir.2000) (reasoning that the petitioner should have called his father as a "critical corroborating witness," when the father lived "in a nearby suburb," had "no reason to fear attending the hearing," and the petitioner "never testified that his father was ill, out of town, or otherwise indisposed"), *with Guo v. Ashcroft,* 361 F.3d 1194, 1201 (9th Cir.2004) (stating that a document was not easily available because it was in China, and noting that corroboration from relatives outside the United States is almost never easily available). Securing verification of flight records and of entry into the United States from the NIIS is not a "relatively uncomplicated task," especially given the variety of spellings used for Shire's actual name and assumed name, as well as the well-known problems the INS has had tracking immigrants into the United States. *Chebchoub,* 257 F.3d at 1044–45 (internal quotation marks omitted).

The IJ faulted Shire for failing to get a medical report from the doctor who treated his thumb and for failing to obtain verification from the UN about his pres-

ence in the refugee camps. In *Guo*, we held that corroborating evidence was not easily available because it was in China. *Guo*, 361 F.3d at 1201; *see also Sidhu*, 220 F.3d at 1091–92 (noting that an affidavit from someone living outside the United States is "almost never easily available"). Yet obtaining a statement from a relative outside the country is a comparatively easier task than obtaining a medical record from a hospital in Kenya, especially after having lived in several refugee camps. The medical record was not "easily available" and the IJ himself saw the stump of Shire's thumb. Regarding verification of Shire's presence in the refugee camps, Shire submitted a letter from the UN High Commissioner for Refugees which states that it cannot verify the status of anyone who was a refugee in Kenya. This is not surprising, considering that, according to the letter, "there were sixteen camps housing 420,000 refugees from different countries, including Somalia, Sudan, and Ethiopia," and there was no computerized database of the refugees.

■ The IJ found the letters from Shire's family to be "suspect" because they were not "executed under jurat of notary public or under declaration of penalty of perjury." "Mere failure to authenticate documents, at least in the absence of evidence undermining their reliability, does not constitute a sufficient foundation for an adverse credibility finding." *Wang*, 352 F.3d at 1254. The letters were accompanied by envelopes indicating that they had come from Kenya. Shire testified that he did not recognize the handwriting of the

letters because someone helped his family write them. " 'There is no evidence in the record to indicate that the [documents] are anything but what [they purport to be].' " *Id.* (quoting *Shah*, 220 F.3d at 1071) (alterations in original).

## CONCLUSION

Shire's testimony was detailed, internally consistent, and consistent with his statement accompanying his asylum application. Overall, "[t]he record lacks evidence upon which an adverse credibility determination can be made." *Ge*, 367 F.3d at 1125. We therefore reject the adverse credibility determination and deem Shire credible. Accordingly, we grant Shire's petition and remand for the IJ to consider Shire's withholding and CAT claims.[8]

**PETITION FOR REVIEW GRANTED.**

---

8. Although we do not have jurisdiction over the denial of Shire's asylum claim, we encourage the IJ to reconsider Shire's asylum claim on remand. Given that Shire's testimony must be accepted as credible, he has complied with the one-year filing deadline, and the IJ remarked that, if he had found Shire credible, he would have granted his asylum application. We agree that Shire's compelling testimony has established past persecution.