**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RAJ KUMAR,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 03-70191

Agency No.
A75-579-218

RAJ KUMAR,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 03-73449

Agency No.
A75-579-218

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
July 12, 2005—Pasadena, California

Filed January 23, 2006

Before: Stephen Reinhardt, Alex Kozinski, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Kozinski

## COUNSEL

Garish Sarin, Law Offices of Garish Sarin, Los Angeles, California, for the petitioner.

Peter D. Keisler, Assistant Attorney General; Linda S. Wendtland, Assistant Director; John S. Hogan, Office of Immigration Litigation, Washington, D.C., for the respondent.

**OPINION**

REINHARDT, Circuit Judge:

Raj Kumar (Raj), an Indian citizen and native of the northern Indian state of Jammu and Kashmir, petitions for review of the Board of Immigration Appeals' (BIA) order affirming, without an opinion, the denial of his applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). He also petitions for review of the BIA's denial of his motion to reopen. We conclude that the Immigration Judge (IJ) erred in finding (1) that Raj was not credible, (2) that Raj had not established a nexus between his past persecution and at least one of the five protected grounds enumerated in 8 U.S.C. § 1101(a)(42)(A), and (3) that Raj had failed to demonstrate a reasonable fear of future persecution.

FACTUAL AND PROCEDURAL BACKGROUND

According to Raj's sworn declaration, in the early morning of January 6, 1998, police officers stopped him as he walked to his neighborhood temple in Jammu and Kashmir and asked him whether he knew the whereabouts of Syed Ali Shah, whom the police had identified as a suspected terrorist and Muslim separatist. Raj pointed the officers in the direction of Shah's house but initially refused to accompany them there, in part because he did not believe that Shah was a terrorist. After the officers physically assaulted Raj and threatened him with arrest and possible death if he did not cooperate, he agreed to lead them to Shah's house.

When Raj and the police arrived at Shah's residence, Shah answered the door carrying a gun. Upon seeing that Raj was with law enforcement personnel, Shah attempted to flee and was shot by the officers and thereafter arrested. After Shah's arrest, Raj was released by the police. Several hours later, individuals associated with Shah came to the Kumar home and, believing that Raj had been involved in Shah's arrest,

began yelling threats and throwing stones at the house. That evening, Raj and his brother Rajinder were arrested by the local police. The arresting officers informed them that Shah had died from his gunshot wounds but, prior to his death, had told the police that Raj and Rajinder were involved in terrorist activities.

The brothers were taken to the police station, where Raj was repeatedly and severely beaten with wooden sticks and leather belts by officers who told him that he would be killed if he did not disclose the identities of Muslim terrorists and reveal information about their planned terrorist activities. Despite Raj's truthful pronouncements that he was not involved with any militant or terrorist organization and could not provide the police with any relevant information, his confinement and physical abuse continued until February 6, 1998, when his father successfully bribed a police officer to release him along with his brother.

When Raj returned home from the police station he discovered that, during his confinement, individuals associated with Shah who were involved with Muslim terrorist organizations had come to the Kumar home seeking revenge for Shah's arrest and death. These individuals had killed Raj's brother Ram and also threatened to kill Raj, Rajinder and other members of the Kumar family. When Raj and Rajinder learned of these threats, they fled India; the two brothers arrived in the United States by way of Germany and Canada on February 26, 1998, and subsequently separated.

On or about April 24, 1998, Raj applied for asylum and withholding of removal. At a brief preliminary hearing before the IJ on December 16, 2000, Raj additionally requested relief under CAT. A hearing on the merits of Raj's case was held on May 25, 2000. At that hearing, Raj submitted in evidence, among other things, his sworn declaration detailing the events described above, Rajinder's application for asylum, the death certificate for his brother Ram which was sent from Jammu

and Kashmir, a letter from his mother and father stating that a newly-appointed police official had threatened to kill him if he returned to India, and several photographs depicting injuries suffered from the beatings at the police station. Also in evidence were country reports from India which stated, among other things, that India was the site of significant civil rights abuses stemming from "deficient police methods and training" as well as "violent secessionist movements" responsible for "extrajudicial executions and other political killings, torture, and brutality." These problems were "acute in Jammu and Kashmir," where "torture and rape by police" and "arbitrary arrest and incommunicado detention" operated in conjunction with a "judicial system [that] barely functions."

On September 14, 2001, the IJ denied Raj's applications for asylum, withholding of removal, and relief under CAT. The IJ based the decision on his findings (1) that Raj was not credible, (2) that Raj had failed to establish a nexus between the harm suffered and a protected ground, and (3) that the threat of future persecution was speculative and thus Raj's fear of it was not reasonable.

With respect to his first finding that Raj was not credible, the IJ concluded that Raj had submitted fraudulent documentary evidence. Specifically, the IJ determined that a number four written on the date line of Rajinder's asylum application was "precisely the same peculiar and uniquely styled" number four that was written on Ram's death certificate. Based upon this and nothing more, the IJ surmised that the death certificate was likely forged by Raminder Singh, who had prepared the asylum applications for both Raj and Rajinder.

The IJ also noted that several of the photographs attached to Raj's asylum application which purported to show injuries that he had suffered at the hands of the Indian police officers were identical to photographs attached to Rajinder's application. The IJ concluded based upon this finding that Raj was attempting to claim injuries that were actually suffered by his

brother. The IJ also stated that he did not believe Raj's contention that he did not know where Rajinder was at the time of the hearing, despite Raj's statements that Rajinder was a truck driver and that the brothers had separated out of economic necessity. According to the IJ, these considerations taken together with what the IJ determined to be inconsistencies between Raj's factual allegations and the Indian country reports required an adverse credibility finding.

Second, the IJ ruled that, even if Raj was credible, he was ineligible for asylum because he had failed to establish a nexus between the harm that he had suffered and at least one of the five grounds protected by the asylum provision of the Immigration and Nationality Act (INA). On this point, the decision stated as follows: "[Raj] has no political contact nor associations with any group whatsoever. He had no contacts with any militants. . . . Here, questions were asked and a confession requested. That was the extent of the testimony about a nexus about the harm suffered and one of the five enumerated grounds from the respondent." With respect to his third finding that Raj had also failed to establish a reasonable fear of future persecution, the IJ cited only evidence that Raj's parents remained in India and had not been harmed by the separatist factions that had killed Raj's brother and threatened the lives of Raj and Rajinder. Based upon these three findings, the IJ denied Raj's application for asylum.

Incorporating by reference his analysis of Raj's asylum claim, the IJ also denied Raj's application for withholding of removal because that standard is more difficult to meet than the asylum standard. He ruled that because Raj could not meet the lesser asylum standard, he necessarily could not meet the stricter standard for withholding of removal.

Lastly, the IJ determined that Raj was not entitled to relief under CAT. The IJ cited his credibility ruling and further held that, even if Raj's allegations were true, the harm that he had

suffered at the police station did not rise to the level of torture as that term is defined under CAT.

On December 13, 2002, the BIA affirmed the IJ's decision without an opinion. Raj filed a motion to reopen, which the BIA denied. He subsequently petitioned for review of both rulings. This appeal consolidates the two petitions for review, although Raj's brief does not address the denial of his motion to reopen.

## STANDARD OF REVIEW

We review for substantial evidence the BIA's decision that an applicant has not established eligibility for asylum. *Njuguna v. Ashcroft*, 374 F.3d 765, 769 (9th Cir. 2004). Under that standard, the BIA's determination must be upheld if it is supported by reasonable, substantial and probative evidence from the record. *Knezevic v. Ashcroft*, 367 F.3d 1206, 1210-11 (9th Cir. 2004); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("[t]o reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it").

We also review under the substantial evidence standard the BIA's decision that an applicant has not met the higher burden required for withholding of removal, *Thomas v. Ashcroft*, 359 F.3d 1169, 1174 (9th Cir. 2004) *reh'g en banc granted*, 382 F.3d 1154 (9th Cir. 2004), *superceded sub nom. Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005), and the findings underlying its decision that an applicant is not eligible for relief under CAT. *Bellout v. Ashcroft*, 363 F.3d 975, 979 (9th Cir. 2004). Adverse credibility determinations are also reviewed under the substantial evidence standard. *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1102 (9th Cir. 2004).

Where, as here, the BIA adopts the reasoning of the IJ without an opinion of its own, we review the decision of the

IJ applying the rules set forth above. *Zahedi v. INS*, 222 F.3d 1157, 1162 (9th Cir. 2000).

## ANALYSIS

I.   Adverse Credibility Finding

A.   Purported Forgery of Ram's Death Certificate

The IJ found that Raj was not credible, relying in large part upon his determination that Ram's death certificate, which was submitted in support of Raj's asylum application, was likely a forgery. The sole reason the IJ posited to support this conclusion was that the death certificate contained a "peculiar and uniquely styled" number four that was similar to a number four handwritten in Rajinder's asylum application. Because Rajinder's application was prepared by Singh, as Raj's was, the IJ concluded that Singh had forged the death certificate.

**[1]** "We do not accept blindly an IJ's conclusion that a petitioner is not credible." *Aguilera-Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir. 1990). Rather, we examine the record to determine "whether substantial evidence supports that conclusion, and . . . whether the reasoning employed by the IJ is fatally flawed." *Id*. Adverse credibility findings may not be based upon speculation or conjecture. *Vera-Villegas v. INS*, 330 F.3d 1222, 1231 (9th Cir. 2003). In judging the veracity of documentary evidence, the IJ must use the same standard he would in judging the credibility of testimonial evidence: "an IJ must provide a specific, cogent reason for rejecting [the evidence], and this reason must bear a legitimate nexus to that rejection." *Zahedi*, 222 F.3d at 1165.

**[2]** It would be difficult to imagine a more precise example of "speculation and conjecture" than the IJ's finding, based upon nothing more than his own uninformed visual comparison of the two number fours at issue, that Singh had forged

Ram's death certificate. In fact, the date containing the "suspect" number four in Rajinder's asylum application was not "4/29/98," as the IJ stated in his decision, but rather "4/24/98," as verified by the corresponding typewritten date on the following page. Thus, although the IJ was willing to brand the death certificate a forgery based upon his own visual comparative handwriting analysis of a number four in Rajinder's asylum application, he misidentified a different number four in the same date in the same document.

**[3]** Further, the IJ failed to substantiate his opinion regarding the legitimacy of Ram's death certificate by submitting the documents to a handwriting expert or forensic laboratory for review or testing. Although there is no rule in this circuit that IJs must consult experts prior to rejecting documentary evidence, in several cases in which IJs have made adverse credibility findings based upon forged documents, those findings have been supported by evidence from experts. *See*, *e.g.*, *Yeimane-Berhe v. Ashcroft*, 393 F.3d 907, 910 (9th Cir. 2004) (INS submitted a report from its forensic document laboratory stating that the medical certificate at issue was a forgery); *Zahedi*, 222 F.3d at 1165 (IJ relied upon a letter from the INS laboratory which stated that it could not authenticate a death certificate).

**[4]** Here, the IJ sought no support for his opinion that the two "peculiar and unique" number fours were handwritten by the same person, nor did the government proffer any expert evidence to support that conclusion. Accordingly, the IJ's determination that Ram's death certificate was forged was fortified by no evidence other than his own visual handwriting analysis, which as discussed above, was both uninformed and inaccurate. The IJ's conclusion, on this basis, that Ram's death certificate was a forgery was nothing more than conjecture unsupported by the evidence in the record. Thus, we are compelled to reject it.[1]

---

[1]Were we to offer our own uninformed analysis after examining the various number fours at issue, we would not find any basis for concluding

**[5]** The IJ's finding that Ram's death certificate was a forgery must be rejected on a second ground as well: the IJ failed to provide Raj with the opportunity to explain the perceived similarity between the numerals in the death certificate and Rajinder's asylum application. *See Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999) ("[T]he BIA must provide a petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that form the basis of a denial of asylum."). In fact, the IJ was obliged not only to allow Raj to explain the supposed similarity, but also to consider and address that explanation in his decision, which he failed to do. *Kaur v. Ashcroft*, 379 F.3d 876, 887 (9th Cir. 2004) ("An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency."). The failure on the part of an IJ to allow a petitioner the opportunity to respond to questions regarding his credibility, particularly when such questions form the basis for the denial of asylum, amounts to the denial of due process. *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 661 (9th Cir. 2003). There can be no doubt that Raj's due process rights were violated here.[2]

## B.   Photographs

The IJ also concluded, after comparing photographs in Raj's asylum application to those submitted in support of Rajinder's application, "that in fact, some of the alleged inju-

---

that they were written by the same person, let alone sufficient basis to conclude with the requisite degree of certitude that they were. However, our uninformed visual analysis is of no greater probative value than the IJ's, and we give it no import here.

[2]The brief that Raj submitted to the BIA explains that he was given no opportunity to respond to the IJ's speculation of forgery and requests a "remand[ ] to permit forensic examination of the allege[d] forgery . . . ." In a case such as this, where more objective proof might be easily obtained, Raj ought to have been given — as he stated to the BIA — an opportunity to respond.

ries and photos about them were actually photos of respondent's brother, and not his at all." The IJ found that Raj's attempt to "pass off" his brother's injuries as his own was "consistent with [his] attempts to deceive this Court about the veracity of his claim to asylum."

During Rajinder's testimony, he acknowledged that several of the photographs that were included in both his and his brother's asylum applications depicted injuries suffered by Raj. Rajinder explained that his application, as well as Raj's, was prepared by Singh, and that it was possible that Singh had inadvertently attached photographs to his application that were meant to support only Raj's. There was one photograph (not "some"), however, that was included in Raj's asylum application that showed injuries to Rajinder's foot. In Rajinder's asylum application, that photograph was labeled "my foot," whereas it contained no such label in Raj's application. This appears to be the only photograph in Raj's asylum application that depicts an injury suffered by Rajinder.

In Rajinder's file, in fact, the other photographs were labeled as depicting Raj's injuries, presumably because corroboration of injuries to both brothers was relevant to the events recounted by Rajinder in his application (events nearly identical to those described in Raj's application). The inclusion of a single photograph of Rajinder's foot injury in Raj's set of photographs submitted to the INS is consistent with this notion. Raj did not, in his testimony or on the photographs themselves, specifically identify the foot in the picture as his own, although he did so identify one other photograph. Thus, any clerical error in the assembly of Raj's application and supporting evidence resulted almost surely from a careless failure by Singh to mark the photographs accurately, not from an attempt to pass off a single, inconsequential injury of Rajinder's as having been incurred by Raj.[3] There is no reason

---

[3]We note that Singh prepared Raj's asylum application in English, which Raj does not speak. Thus, Raj likely did not, because he could not,

why the preparer would have labeled the photographs in Rajinder's file accurately but purposely failed to label similarly the same photographs in Raj's file, particularly as most of the photographs in Raj's file were of his own injuries and those injuries were the more serious.

**[6]** Among the extensive evidence submitted in support of Raj's asylum application, including evidence of serious injuries suffered by Raj such as a torn muscle that required surgery and crushed fingers, the discrepancy created by a single unlabeled photograph depicting a minor injury to Rajinder's foot is in question. Discrepancies such as the one presented here that are capable of being attributed to clerical errors may not form the basis of an adverse credibility finding "unless the IJ or the BIA specifically explains the significance of the discrepancy or points to the petitioner's obvious evasiveness when asked about it." *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000). Neither condition is satisfied in this case. The IJ did not explain his reason for rejecting a clerical explanation for the failure to label the photographs properly, as was done in Rajinder's application. Nor was the petitioner asked for an explanation, so he was not "evasive" in responding. We conclude, therefore, that the IJ's determination that Raj attempted to "pass off" his brother's injuries as his own is not supported by substantial evidence. Thus, we are compelled to reject this ground for the IJ's credibility finding as well.

C.   Contact with Rajinder

The IJ stated in his decision that "[i]t is also inconsistent with credibility for the respondent to lead this Court to believe, his brother and the respondent made their way to the United States and then separated." The IJ's only support for

---

review his application before it was submitted. We note also that Raj's application contains numerous spelling and grammatical errors, which suggest that Singh was generally careless in preparing Raj's application or was otherwise unqualified or incompetent.

this finding was his opinion that it was "unusual" for Raj not to know the whereabouts of Rajinder after they had grown up and fled India together.

In *Shah*, this circuit ruled that an IJ had improperly discounted a petitioner's credibility on the basis of his disbelief that the petitioner and her husband had not received more correspondence than they had submitted from a certain political party for whom the husband had worked for ten years. 220 F.3d at 1071. The *Shah* court ruled that such disbelief amounted merely to speculation and conjecture. *Id*. In *Lopez-Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996), the IJ found "astonishing" the petitioner's contention that he had not been killed by guerillas after being chased, shot at and beaten. In that case as well, the court rejected the IJ's finding, ruling that the conclusion was not based upon a cogent reason, but rather upon "personal conjecture about what guerillas likely would and would not do." *Id*.

Similarly here, the IJ's adverse credibility determination, insofar as it was based upon his opinion regarding what brothers from India who had grown up and fled India together might or might not do, was purely conjecture. Further, an examination of the record reveals that Raj's testimony regarding his knowledge of the whereabouts of his brother was not at all "unusual." Raj testified at his May 25, 2000, hearing that Rajinder was working with a trucking company somewhere in California and was not easily reachable, that he had seen him "three or four months ago," and that he had not attempted to contact Rajinder prior to the hearing because "I did not know that he would also be needed here." Later in the hearing, the IJ scheduled a status conference for June 9 and directed Raj to locate his brother prior to that date. At the June 9 hearing, Raj's counsel informed the IJ that Raj had located Rajinder and that he would be able to appear as a witness in Raj's case.

[7] As was the case in *Lopez-Reyes*, the IJ's finding that it was "unusual" that Raj did not know where Rajinder was as

of the date of the May, 2000, hearing was impermissibly based upon personal conjecture rather than supportable, cogent reasoning.

D.   Purported Inconsistencies Between Allegations and Country Reports

Last, the IJ's determinations that Raj's substantive claims were inconsistent with the factual findings in the Indian country reports and were implausible are not supported by substantial evidence.

**[8]** With respect to the IJ's finding that Raj's narrative was inconsistent with the Indian country reports, the IJ stated in his decision that there was no support in the country reports for Raj's claims (1) that the local police in Jammu and Kashmir asked him, a civilian, for the whereabouts of Shah, a suspected terrorist, and then compelled him to accompany them to Shah's home, and (2) that the police later arrested him based upon Shah's statement that Raj was involved in terrorist activities. A review of the Indian country reports submitted into evidence in this case compels us to conclude that the IJ's findings regarding country conditions are not only unsupported by substantial evidence, they are clearly erroneous. Although the Indian country reports do not detail identical incidents to those described by Raj in his sworn affidavit, they do warn of "deficient police methods" and violent police suppressions of Muslim separatist movements. In Jammu and Kashmir, the tensions between local authorities and the terrorist elements are so severe, local government security forces have regularly "killed suspected militants and civilians; with few exceptions, they acted with impunity." Further, the authorities act in this regard with "judicial tolerance of the Government's heavy-handed antimilitant tactics."

Second, Raj's account of the events of January 6, 1998, is not implausible, and it is certainly not a basis for finding his testimony not credible. Raj testified that his family owned a

tailoring shop in his village, and that he often would deliver finished garments to his customers' homes. Shah's home was in very close proximity to the Kumar shop and, although Raj had never personally delivered anything to Shah, Shah was a customer and Raj knew where Shah's house was because he regularly "used to pass by that way." Raj also testified that the officers who accosted him came from the local police station, which was three to four miles away from his family's shop and the Shah residence. It would not be implausible for police officers to drive three to four miles from their headquarters into a remote neighborhood looking for a suspected terrorist, and then to ask an individual from that neighborhood where the suspected terrorist lived. The IJ's opinion, unsupported by any evidence, as to what local police in Jammu and Kashmir might or might not do in their efforts to find a suspected criminal is based upon speculation and conjecture. *Lopez-Reyes*, 79 F.3d at 912.

[9] Thus, Raj's account of the police officers' treatment of him during the early morning of January 6, 1998, and his statements regarding his subsequent arrest and beatings are both consistent with the Indian country reports cited by the IJ and are plausible. The IJ's findings to the contrary, like the other factual findings underlying his adverse credibility determination, are not supported by substantial evidence.

In view of the above, Raj's testimony must be deemed credible.[4]

II.   Nexus Between Persecution and Protected Ground

In addition to holding that Raj was not credible, the IJ ruled in the alternative that he had failed to establish past persecution on the basis of a qualifying protected ground. The IJ's

---

[4]When our dissenting colleague quotes eleven separate statements from dissenting opinions, mainly his own, it is not difficult to determine that the law is not on his side.

ruling relied upon his finding that Raj was a law-abiding citizen with no political contact or affiliation with any terrorist or militant organization, and thus was not persecuted based upon any political opinion or association.

**[10]** It is settled law that an applicant may establish a political opinion for purposes of asylum relief by showing an "imputed political opinion." *See Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997). And, we have repeatedly held that an applicant can establish imputed political opinion based upon the persecutor's erroneous belief as to the applicant's political affiliation or opinion. *See*, *e.g.*, *Singh v. Ilchert*, 63 F.3d 1501, 1508-9 (9th Cir. 1995) (finding an imputed political opinion where Indian police officers persecuted the petitioner based upon a false belief that he was affiliated with Sikh militants); *Blanco-Lopez v. INS*, 858 F.2d 531, 533-34 (9th Cir. 1988).

**[11]** Here, the evidence in the record shows that Raj endured a month-long detention and serious physical abuse as a result of the Jammu and Kashmir police's mistaken belief that Raj was associated with a Muslim terrorist group. The fundamental fact relied upon by the IJ in ruling that Raj had failed to establish a nexus between persecution and a protected ground — that Raj was not in fact a member of a terrorist organization — is irrelevant to the imputed political opinion analysis. Rather, "the focus of inquiry turns away from the views of the victim to the views of the persecutor . . . . If the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion as required under the Act." *Sangha*, 103 F.3d at 1489 (citation omitted). The facts in this case are substantively indistinguishable from those in *Singh* and *Sangha*; the evidence is clear that Raj was detained and physically assaulted on the basis of a political opinion imputed to him. Thus, we must reject the IJ's finding that Raj did not establish a nexus between his past persecution and a protected ground; the record compels us to rule that Raj

has suffered persecution on the basis of an imputed political opinion.

III.   Reasonable Fear of Future Persecution

The IJ also ruled that Raj had failed to establish a reasonable fear of future persecution. The IJ found, solely based upon evidence showing that Raj's parents had not been harmed since he fled the country, that Raj's fear of persecution by local law authorities in Jammu and Kashmir was "speculative."

[12] In order to establish a reasonable fear of future persecution, an applicant must show that his fear of persecution is both subjectively genuine and objectively reasonable. *Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2002). An applicant can satisfy the subjective component of the two-part test by credibly testifying that he genuinely fears persecution. *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998). He can satisfy the objective by "showing [ ] credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution." *Ghaly v. INS*, 58 F.3d 1425, 1428 (9th Cir. 1995) (citation and quotation marks omitted). That fear "must be based on an individualized rather than generalized risk of persecution." *Hoxha*, 319 F.3d at 1182.

[13] Because we find that Raj is credible, and because he has testified that he believes that the local police in Jammu and Kashmir will kill him if he returns to India (a belief that is supported by the letter from his parents so stating), he has satisfied the subjective component of the well-founded fear test.

[14] Further, Raj has also satisfied the objective reasonableness component of the test. According to the Indian country reports, local security forces in Jammu and Kashmir attempting to combat insurgent elements regularly use excessive force, including torture and rape, when dealing with

civilians, and they summarily kill suspected terrorists "with impunity," including those already in police custody. Raj's fear of such persecution is certainly based upon individualized risk — the police's erroneous belief that he was a terrorist caused him to be subjected to a month-long detention that included severe physical attacks and threats to his life. We may consider the reasonableness of Raj's fear "in the political, social, and cultural milieu of the place where [he] lived, and even a ten percent chance of persecution may establish a well-founded fear." *Khup v. Ashcroft*, 376 F.3d 898, 904 (9th Cir. 2004) (citations and quotation marks omitted). Here, the acute social and political tensions in Jammu and Kashmir considered together with Raj's prior experience as the victim of police violence and the letter from his parents stating that local security forces have threatened to kill him if he returns to India require a finding that he has met his burden of showing a well-founded fear of future persecution.

The fact that Raj's parents have not been harmed in his absence does not compel a different result. This court did hold in *Hakeem v. INS*, 273 F.3d 812, 816 (9th Cir. 2001), that "[a]n applicant's claim of persecution upon return is weakened, even undercut, when similarly-situated family members continue to live in the country without incident." However, the facts in *Hakeem* are entirely distinguishable from those in this case; critically, the family members at issue in *Hakeem* were in fact "similarly situated," whereas here they are not. In *Hakeem*, the petitioner asserted that he would be killed upon returning to Pakistan because, according to the law as decreed in the Koran, an individual who changes his religion, as the petitioner had done, is automatically sentenced to death. 273 F.3d at 817. The court rejected Hakeem's claim, in part because several members of his family who had remained in Pakistan and had also changed their religion had not been persecuted. *Id.*

[15] Here, there is no evidence that the police in Jammu and Kashmir suspect Raj's parents of associating with the

same Muslim separatist faction to which they accuse Raj of belonging. In other words, the political opinion that the Indian police have imputed to Raj and which forms the basis of Raj's past persecution has not been imputed to Raj's parents; thus, they are not "similarly situated," and it is irrelevant that they have not suffered from the treatment that Raj fears.

**[16]** The IJ's finding that Raj failed to establish a well-founded fear of future persecution is not supported by substantial evidence.

IV.   Withholding of Removal

The IJ's denial of Raj's application for withholding of removal relied exclusively upon his ruling denying Raj's asylum application. However, we have reversed the IJ's adverse credibility finding and rejected his rulings that Raj failed to establish (1) past persecution on the basis of a protected ground and (2) a reasonable fear of future persecution.

Because the IJ failed to consider Raj's claim for withholding of removal on its merits, we remand that claim to the BIA so that it may now consider it in light of our holdings herein.

V.   Relief Under CAT

The IJ ruled that Raj was not entitled to relief under CAT because, *inter alia*, the harm that he claimed to have suffered in the Jammu and Kashmir police station did not rise to the level of torture as defined under the statute.

Although Raj undeniably suffered abuse in the Jammu and Kashmir police station, we are unable to conclude that the IJ's ruling that it did not amount to torture was not supported by substantial evidence. *See Gui v. INS*, 280 F.3d 1217, 1230 (9th Cir. 2002). Thus, we affirm the BIA's determination that Raj is not entitled to relief under CAT.

## VI.   Motion to Reopen

Because Raj's appellate brief does not address the BIA's denial of his motion to reopen, we consider argument on that issue waived. *See Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) ("[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.") (citation and quotation marks omitted).

## CONCLUSION

[17] We reverse the IJ's adverse credibility finding and hold that Raj has demonstrated both past persecution on account of an imputed political opinion and a well-grounded fear of future persecution. Accordingly, we find Raj statutorily eligible for asylum, and we remand for an exercise of discretion on his asylum claim and for further consideration of his withholding of removal claim. We affirm the BIA's denial of Raj's application for relief under CAT. We deny Raj's petition for review of the BIA's denial of his motion to reopen.

Petition for review is GRANTED in part, DENIED in part, and REMANDED for further proceedings.

---

KOZINSKI, Circuit Judge, dissenting in part:

My colleagues grumble that an immigration judge shouldn't pretend to be a "handwriting expert" or a "forensic laboratory." Maj. at 840. But a circuit judge shouldn't pretend to be an immigration judge. This is yet another tiresome "example of the nitpicking we engage in as part of a systematic effort to dismantle the reasons immigration judges give for their decisions." *Abovian* v. *INS*, 257 F.3d 971, 980 (9th Cir. 2001) (Kozinski, J., dissenting from denial of rehearing en banc) (listing other examples).

**1.** After hearing the testimony of Raj Kumar and his brother Rajinder, the immigration judge (IJ) found as follows:

> This Court is of the opinion that [Raj Kumar] submitted fraudulent documents to bolster his claim to asylum.
>
> . . . .
>
> As seen in collective Exhibit 4, [Raj] attempted to pass off as his own injuries, the photos submitted as part of this Exhibit. . . . [I]n fact, some of the alleged injuries and photos about them were actually photos of [Raj's] brother, and not his at all. This attempt to pass off as his own injuries, is consistent with [Raj's] attempts to deceive this Court about the veracity of his claim to asylum.

Based on this finding of immigration fraud and other inconsistencies in Raj's testimony and evidence, the IJ made an adverse credibility determination and, not believing Raj's story, denied his claim for asylum.

Both Congress and the Supreme Court have instructed that an adverse credibility finding is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see INS* v. *Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992). Our role is not to substitute our own judgment regarding an asylum applicant's credibility for that of the IJ; for us to overturn an IJ's adverse credibility finding, the applicant must present evidence that not only supports a finding of credibility, "but *compels* it." *Id.* at 481 n.1; *Farah* v. *Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003). And, when an IJ compiles multiple reasons for disbelieving the applicant, we must accept the IJ's finding even if only *one* reason that goes to the heart of the applicant's claim is supported by substantial evidence. *See Li* v. *Ashcroft*, 378 F.3d 959, 964 (9th Cir. 2004). The majority dutifully recites

this standard of review, *see* maj. at 838-39, but its analysis belies the deference an IJ is due. *See Quan* v. *Gonzales*, 428 F.3d 883, 890 (9th Cir. 2005) (O'Scannlain, J., dissenting) ("[T]he court has substituted its independent analysis of the record for that of the Immigration Judge . . . and, in so doing, has exceeded its authority and intruded upon the proper role of the fact finder."); *Jahed* v. *INS*, 356 F.3d 991, 1002 (9th Cir. 2004) (Kozinski, J., dissenting) ("[O]ur court seems bent on denying the BIA the deference a reviewing court owes an administrative agency.").

The heart of Raj Kumar's asylum application is his claim that he suffered repeated beatings and sustained multiple injuries at the hands of Indian police. To support his contentions, Raj submitted, along with his asylum application, photographs allegedly depicting his injuries. He also presented these photographs as evidence in his hearing before the IJ. Further, after some prodding by the IJ, he presented his brother Rajinder—who had filed his own asylum application, with photographs—to corroborate his claim.

It is undisputed that four of the five photographs Raj submitted were identical to the photographs Rajinder had submitted in his own asylum application. The IJ did not need to engage in "speculation or conjecture," maj. at 839, to see that the photos are the same; he needed only compare the two sets of photos in the record. And although we don't know which brother's photos were actually depictions of the other brother's injuries—or whether either set of photos depicted neither brother at all—we do know that both sets of photos could not be what the Kumar brothers claimed them to be.

The majority concedes that at least one of the photographs in Raj's application "depicts an injury suffered by Rajinder." Maj. at 842. And it does not dispute that the injuries Raj claims to have suffered at the hands of the Indian police are the "heart" of his asylum application. This alone is substantial evidence supporting the IJ's findings. *See Li*, 378 F.3d at 962

("An adverse credibility ruling will be upheld so long as iden-
tified inconsistencies go to the heart of the asylum claim."
(alteration and internal quotation marks omitted)). *Cf. Men-
doza Manimbao* v. *Ashcroft*, 329 F.3d 655, 660 (9th Cir.
2003) ("Minor inconsistencies in the record that do not relate
to the basis of an applicant's alleged fear of persecution, go
to the heart of the asylum claim, or reveal anything about an
asylum applicant's fear for his safety are insufficient to sup-
port an adverse credibility finding.").

Yet the majority concludes, inexplicably, that Raj did not
"attempt[ ] to 'pass off' his brother's injuries as his own."
Maj. at 843. It then proceeds to engage in its own "specula-
tion and conjecture" about how the photograph of Rajinder's
injury might have found its way into Raj's asylum applica-
tion, and been submitted as evidence during the course of
Raj's removal hearings: There might very well have been a
good explanation; it's possible it was the result of careless-
ness; it could have been a clerical error. *See id.* at 842-43.
Were the members of the majority sitting as immigration
judges, these hypothetical excuses might have given them a
basis for concluding that Raj's testimony was believable. But
they do nothing to undermine the uncontroverted evidence
that Raj submitted at least one photo of his brother's injuries
and claimed it as his own, and they certainly do not render
irrational the IJ's conclusion that the phony photograph was
part and parcel of a pattern of deception.

Raj had plenty of opportunities to explain why the same
photographs appeared in both applications. He could have
offered an explanation when he submitted the photographs
into evidence at the hearing, or when he described his injuries
on direct examination. Further, when the duplicative photo-
graphs were brought to the IJ's attention during brother
Rajinder's testimony, Raj and his attorney were put on notice
of the cause for concern:

  [INS ATTORNEY] TO RAJINDER KUMAR

Q: Sir, would you look at Exhibit 6, see if you recognize that document?

A: Yes.

Q: What is that document?

A: That is my, I, I'm the one who filled this out.

Q: It's an application for asylum?

A: Yes.

Q: And would you look at the photographs. Do you recognize that photograph?

A: Yes.

Q: And who is that of?

A: This is of my foot.

Q: And would you identify this, second photograph?

A: Yes.

Q: What is it?

A: That's my brother's—

Q: Your brother's what?

A: The stitches on his (indiscernible).

Q: And a third photograph, would you identify that?

A: That's also my brothers.

Q: Why are you putting your brother's photographs in your file?

A: I did not, maybe it was by mistake. I did not do it myself.

. . . .

Q: Sir, I'm showing you a photograph of a foot, in your brother's file. Would you identify the photograph?

A: Yes. That's my foot.

Q: You know why your photographs are in your brother's file?

A: I give this, give this to a person named Mohamed. And he put everything, maybe it was mistake or something.

Despite hearing this exchange with his brother, Raj offered no explanation for the discrepancies, and did nothing to confirm Rajinder's conjecture that "maybe it was [a] mistake or something." Raj's attorney redirected Rajinder for almost an hour, but avoided any mention of the photographs. The IJ then granted Raj a continuance so his attorney could further review Rajinder's documents; when the hearing reconvened a month later, Raj's attorney stated that Rajinder's testimony had been "sufficient," and that he didn't need to ask any more questions. Finally, when asked whether Raj wanted to present "anything further [in] the case in chief," Raj's attorney responded, "No, Your Honor," and waived closing argument.

After the IJ made his adverse credibility determination, Raj had a further opportunity to address this issue in his appeal to the BIA. Yet in his brief to the BIA, Raj did not argue that the photographs were erroneously included in the wrong

application, or that he was unaware of the inclusion of his brother's photographs in his asylum application. Instead, he made only a single unilluminating remark in the "Facts" section of the brief: His immigration consultant "put all the photos of the injuries the two brothers suffered into each application without distinguishing them." Raj doesn't claim, even in his brief, that he was unaware his brother's injury was being passed off as his own.

The majority seizes on the single unsworn sentence in Raj's brief to the BIA, giving it more weight than eleven separate sworn hearings in front of the IJ. The majority even blames the IJ for failing to ask Raj for an explanation, as if his own counsel was a potted plant. Maj. at 843-44. Finally, the majority invents its own version of what must have happened, spinning tales of mea culpas, accidents, and "clerical error[s]" that appear nowhere in the record. *See id.* at 842. It's no wonder Raj didn't bother to explain the inconsistencies to the IJ; he must have predicted—accurately, as it turns out—that the Ninth Circuit would do it all for him.

**2.** The majority next holds that "the IJ's finding that it was 'unusual' that Raj did not know where Rajinder was as of the date of the May, 2000, hearing was impermissibly based upon personal conjecture rather than supportable, cogent reasoning." *Id.* at 844-45. For support, the majority points out that "Rajinder was working with a trucking company . . . and was not easily reachable," and recounts Raj's seemingly reasonable testimony that he "did not know that [Rajinder] would also be needed" at the hearing. *Id.* at 844.

But the majority paints an incomplete picture, and mischaracterizes the IJ's findings. The IJ didn't find it implausible that a long-distance trucker might be difficult to reach; he found implausible Raj's claim that he had no way of contacting Rajinder: "[Raj] was asked a series of questions about his brother and his whereabouts, and his claim to asylum. Basically, [Raj] testified he did not know where his brother was,

nor where he lived or for that matter, his home telephone number." Even long-distance truckers have homes and telephone numbers, and it's highly implausible that the two brothers, who escaped torture and traveled thousands of miles together to get to the United States, would then have separated without giving each other any contact information.

The IJ's skepticism about Raj's claim that Rajinder was untraceable proved well-founded: When the IJ gave Raj only 15 days to locate his brother and bring him to testify, Rajinder magically materialized.[1] Once Rajinder showed up at the hearing, the INS was able to secure his consent so the IJ could compare Rajinder's asylum application to Raj's. As the IJ stated:

> The reason [Raj's] testimony about his brother [is] salient to his claim, is that [Raj led] this Court to believe he was separate and distinct from his brother, and that they were on their own. Only after [Rajinder's asylum application] was entered into the record does it show up that both claims were prepared by the same individual . . . . Only after the brother's application was presented, did it come to light the photos in one, were used in both. And that some of the alleged injuries to Raj were actually, allegedly Rajinder's. . . . That may explain why [Raj] was not inclined to tell this Court, candidly, about the fact that both applications (his and his brother's) were prepared by the same person. These

---

[1] After Raj told the IJ that he didn't know where Rajinder was, and hadn't asked Rajinder to testify, the IJ said, "Sir, you want me to believe, that the same brother who was detained, beaten, threatened is in the United States, and you didn't know that he would be a helpful witness to you. Is that w[hat] you want me to believe? . . . Well, sir, I just don't understand a percipient witness, who had the same problems, in the same family, and he's not produced in the case in chief. Very difficult for me to understand, sir." The IJ then continued the hearing to "allow [Raj] time to find [his] brother."

discoveries also help explain why the respondent did not want this Court to scrutinize both applications together.

In other words, Raj had claimed he and Rajinder had separated after they got to the United States. He did this in order to explain why Rajinder—who could obviously corroborate Raj's story—was absent from Raj's asylum hearing. When the IJ refused to buy Raj's explanation, Rajinder showed up and his presence enabled the IJ to compare the two applications side-by-side. It was only at that point that the IJ was able to see that the same photographs were being offered as evidence in multiple asylum applications, and that the two applications were drawn up by the same individual, on the same day, putting the lie to Raj's claim that he and his brother had gone their separate ways after coming to America.

This is the nub of the IJ's reasoning, which the majority ignores, preferring to nitpick the IJ's isolated statements. But the duplicitous photographs and the alleged inability to locate Rajinder were not disconnected; they were part and parcel of a single fraud that a factfinder, who sees the lie unfolding before his very eyes, is uniquely qualified to identify. Having seen that (1) Raj claimed to be unable to locate his brother, (2) Raj was indeed able to locate Rajinder within 15 days, and (3) Rajinder's testimony revealed their deception, the IJ concluded that Raj had intentionally been trying to avoid producing his brother. Far from being "speculation and conjecture," this was a permissible inference for the IJ to draw based on "supportable, cogent reasoning." And it strongly supports the IJ's finding that inclusion of the false photographs was no mistake but a calculated fraud.

**3.** Even the majority's analysis of the "Purported Forgery of Ram's Death Certificate," maj. at 839-41, is nothing more than a transparent effort to "impos[e] ever more stringent standards on how [IJs and the BIA] must perform their functions." *Abovian*, 257 F.3d at 971. The IJ may not have had a

lot of evidence to buttress his conclusion that the death certificate was a forgery, but—certainly in light of the other deceptions being perpetrated by Raj and Rajinder—the majority has pointed to nothing that would compel a contrary conclusion. *See Elias-Zacarias*, 502 U.S. at 481 n.1; *Farah*, 348 F.3d at 1156. Instead, the majority simply announces that an "uninformed visual" inspection of the document by the IJ was insufficient. Maj. at 839. Although the majority disclaims any "rule in this circuit that IJs must consult experts prior to rejecting documentary evidence," *id.* at 840, that is precisely what the majority requires; without such an expert's opinion, the IJs determination will simply be written off as "conjecture," *id.* at 840. This addition to the already-crushing burden with which our court has saddled IJs is unsupported by law or precedent.

**4.** Finally, not content merely with finding the adverse credibility determination unsupported by substantial evidence, the majority goes on to conclude that the IJ's "fail[ure] to provide Raj with the opportunity to explain" the discrepancies in his application "amounts to the denial of due process." Maj. at 841. Raj does not allege a due process violation in his petition for review, and the majority's unprompted decision to find one is unsupported by our caselaw; it is just another effort to "whittle away the authority and discretion of immigrations judges and the BIA." *Jahed*, 356 F.3d at 1007 (quoting *Abovian*, 257 F.3d at 971) (internal quotation marks omitted).

We have previously held that adverse credibility determinations amount to due process violations in two situations, both relating to the BIA's appellate review of an IJ's decision. The first occurs when the IJ finds an applicant credible, but the BIA makes an adverse credibility determination on review.[2]

---

[2]I have already lodged my disagreement with this nonsensical definition of due process: "[W]hat kind of unfairness can there be when the BIA uses the petitioner's own words against him?" *Abovian*, 257 F.3d at 972-73.

In that situation, the BIA violates the applicant's due process rights if it does not give him advance notice that his credibility is at issue, and afford him an opportunity to explain the perceived discrepancies. *See Campos-Sanchez* v. *INS*, 164 F.3d 448, 450 (9th Cir. 1999). Second, if the IJ makes no explicit credibility finding at all, the BIA may not make an independent adverse credibility determination without giving the applicant notice and an opportunity to be heard. *See Mendoza Manimbao*, 329 F.3d 655, 662 (9th Cir. 2003); *Abovian* v. *INS*, 219 F.3d 972, 975, 980 (9th Cir.), *amended by* 228 F.3d 1127 *and* 234 F.3d 492 (2000), *reh'g en banc denied by* 257 F.3d 971 (2001).

The supposed purpose of these holdings is to ensure that an applicant has notice of the need to defend his credibility in front of the BIA.[3] When an asylum applicant is before the IJ, however, he is already on notice that his credibility is at issue; one of the primary purposes of an asylum hearing is to determine if the asylum seeker is credible. It is the applicant's burden at the hearing to prove he should be believed. *See* 8 C.F.R. § 208.13(a) (burden of proof to establish eligibility for asylum is on the applicant). The IJ has no special burden to "provide [the applicant] the opportunity to explain" why he should be deemed credible. Maj. at 841. That is the very reason the applicant is in front of the IJ in the first place—the hearing *is* his opportunity. And, if at the conclusion of the

This is a "constitutional rule [that] exists nowhere outside the Ninth Circuit." *Id.* at 972. Whereas I had at least taken solace in the fact that, "[i]f the *IJ* had . . . chosen to disbelieve petitioner, he would have had no constitutional right to get back on the stand and patch up his story," *id.* at 973 (emphasis added), this distinction is now out the window. Pretty soon, every denial of asylum will amount to a denial of due process.

[3]In a third line of cases, we have held that when an IJ makes an adverse credibility determination, and the BIA affirms but on different grounds, due process is satisfied because the applicant was on notice that credibility was an issue that would be before the BIA. *See Pal* v. *INS*, 204 F.3d 935, 938-39 (9th Cir. 2000).

hearing, the IJ deems the applicant incredible, the applicant—now on notice that his credibility is in doubt—has the opportunity to appeal such a decision to the BIA.[4]

In fact, Raj *did* appeal the IJ's decision regarding the death certificate to the BIA, and the BIA upheld the IJ's adverse credibility determination anyway. Raj may not like the BIA's decision, but the sufficiency of the process Raj received is not dependent on a favorable result.

**5.** The larger problem with the majority's opinion is its know-it-all approach, an error oft repeated when our circuit reviews immigration cases in which an IJ has made an adverse credibility determination.[5] First, the majority lays out the applicant's story as if it were the gospel truth, making it seem like denial of rehearing will cause a huge miscarriage of justice. Then the majority picks apart the IJ's findings piece by piece, scrutinizing his every sentence as if it is completely unconnected to the rest of his opinion. Don't agree with the IJ that the applicant is lying? Not to worry; just label the IJ's finding "speculation and conjecture." *See* maj. at 839, 840, 844, 844-45; *Vera-Villegas* v. *INS*, 330 F.3d 1222, 1231 (9th

---

[4]We have held that, if an applicant gives an explanation for inconsistencies in his testimony or his supporting evidence, and the IJ neglects to address the explanation given, the IJ's adverse credibility determination should be reversed as unsupported by substantial evidence. *See Kaur* v. *Ashcroft*, 379 F.3d 876, 887 (9th Cir. 2004); *Hakeem* v. *INS*, 273 F.3d 812, 816 (9th Cir. 2001). But this is quite different from holding there is a due process violation in such a situation. And it is different still from requiring an IJ to specifically ask an applicant to provide an explanation in the first place.

[5]I am not the first of our circuit's judges to point this out; nor, I fear, will I be the last. *See, e.g.*, *Jibril* v. *Gonzales*, 423 F.3d 1129, 1138 (9th Cir. 2005) (O'Scannlain, J.) ("The Supreme Court has repeatedly instructed us on the proper standard to apply when reviewing an immigration judge's adverse credibility determination. Time and again, however, we have promulgated rules that tend to obscure that clear standard and to flummox immigration judges, who must contort what should be a simple factual finding to satisfy our often irreconcilable precedents.").

Cir. 2003). Finding it difficult to dispute that the applicant is lying? No problem; just label the inconsistencies "minor," or "merely incidental to [the] asylum claim." *See Abovian*, 257 F.3d 979; *id.* at 978 (listing cases). Having trouble arguing with a straight face that the applicant's lie doesn't go to the heart of his claim? No need to fret; just announce a due process violation. *See* maj. at 841. The net effect is that any asylum applicant who is a skillful enough liar—and many who aren't—must be believed no matter how implausible or far-fetched their story. *See, e.g.*, *Abovian*, 219 F.3d at 982 (Wallace, J., dissenting) (applicant alleged "that *at least fifteen times in one year* he was taken to a hotel room and asked in person, *by the president of [Armenia]*, to join the KGB"). It also means that IJs, who are doubtless chary of being vilified by august court of appeals judges, become even more reluctant to make adverse credibility findings, even when they have good reason to believe the asylum applicant is lying.

None of this bears any resemblance to administrative law, and none of it finds support in the statutes Congress has given us to apply, or the rules the Supreme Court has instructed us to follow. *See INS* v. *Ventura*, 537 U.S. 12, 16-18 (2002) (per curiam); *Elias-Zacarias*, 502 U.S. at 481 & n.1. Although I am bound to follow our circuit's precedents, I cannot be forced to like them, or to pretend that they represent the proper fulfillment of our judicial role.

I am dissenting in this case, rather than concurring, however, because even our insubordinate precedents do not support the absurd result the majority has reached. Asylum claims are often difficult because "[t]he specific facts supporting a petitioner's asylum claim—when, where, why and by whom he was allegedly persecuted—are peculiarly within the petitioner's grasp. By definition, they will have happened at some time in the past—often many years ago—in a land far, far away." *Abovian*, 257 F.3d at 976. This is not such a case. The IJ's adverse credibility finding here is based on fraud that has taken place recently, here in the United States, as part of

the asylum application process. The IJ caught the Kumar brothers red-handed mocking the integrity of our immigration procedures. Once the IJ found that they had committed immigration fraud, he had every right to disbelieve the aspects of their story that *did* take place long ago and far away, as there is nothing to corroborate that story beyond the Kumar brothers' good word and some documents they produced. Our jurisprudence instead allows asylum applicants to manufacture evidence, and forces IJs to swallow it. We do not treat other trial judges with such disdain and disrespect, and there is no justification for doing so when immigration judges are involved.

*     *     *

The IJ's finding that Raj "attempted to pass off [his brother's injuries] as his own injuries" is supported by substantial evidence. Based on this finding alone, the IJ was justified in making an adverse credibility determination and concluding that "[f]raudulent documents are being used to support [Raj's] claim to asylum." If this is not good enough to support an IJ's adverse credibility determination, then nothing short of the applicant admitting "I'm a big fat liar" will do—and maybe not even that. This is not the law, and I refuse to follow my colleagues in making it so. Rather, I would uphold the IJ's adverse credibility determination, and deny Raj's petition for review.